**IN THE UNITED STATES COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RAVI P. RAWAT, on behalf of himself and others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>NAVISTAR INTERNATIONAL CORPORATION,<br><br>        Defendant. | No.    `FILED: MAY 23, 2008`<br>`08CV3038         TG`<br>`JUDGE DARRAH`<br>`MAGISTRATE JUDGE NOLAN` |

## CLASS ACTION COMPLAINT

Plaintiff Ravi P. Rawat on behalf of himself and those similarly situated, for his class action complaint based upon the investigation of his counsel, alleges as follows on information and belief:

## NATURE OF THE ACTION

1.     This action is brought on behalf of employees and former employees of Navistar International who were unable to exercise their vested stock options due to a "blackout" period imposed by Navistar. Navistar's "blackout" period as the result of management malfeasance led to Navistar's having to restate its financials. By allowing options to expire and prohibiting former employees from exercising their vested options pursuant to the option contract, Navistar breached the option contract and its implied covenant of good faith and fair dealing.

## JURISDICTION AND VENUE

2.      Jurisdiction: This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(d), because diversity exists between members of the Plaintiff Class and defendants, and the amount in controversy exceeds $5,000,000.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

3.      This Court retains general jurisdiction over each named defendant who is a resident of Illinois.  Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with Illinois to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  Defendants' conduct arose out of Illinois, where Navistar International maintains its corporate headquarters.  Finally, exercising jurisdiction over the named non-resident defendants is reasonable.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this complaint, including the defendants' primary participation in the wrongful acts detailed herein, breach of contract, breach of implied obligation of good faith and fair dealing occurred in substantial part in this District. Finally, defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

5.    <u>Plaintiff Ravi P. Rawat</u> is a citizen of Illinois and is a former Assistant General Manager of the heavy truck group of Navistar International Corporation.

6.    <u>Defendant Navistar International Corporation</u> is a Delaware Corporation with its principal place of business located at 4201 Winfield Road, Warrenville, Illinois 60555.

### BACKGROUND OF THE WRONGDOING

7.    Plaintiff began working for Defendant Navistar in January 1989. Throughout his tenure at Navistar, Plaintiff was granted stock options on seven occasions.

8.    On April 6, 2006, Navistar announced that as a result of its failure to file with the Securities and Exchange Commission (the "SEC") its Annual Report for the fiscal year ended October 31, 2005 (the Annual Report), the shares of the Company's common stock that were acquired pursuant to the employee benefit plans set forth below would not be available for use until the Annual Report is filed with the SEC.

9.    The Company also announced that it intended to file its Annual Report with the SEC as soon as possible but could not estimate the date such report would be filed.

10.    Because of the Company's prior conduct and the fact that the Company had to restate its financials, it suspended purchases of its shares by participants and beneficiaries in the United States in the following plans: (1) International Truck and Engine Corporation 401(k) Retirement Savings Plan; (2) International Truck and Engine Corporation Retirement Accumulation Plan; (3) International Truck and Engine

Corporation 401(k) Plan for Represented Employees; and (4) the IC Corporation 401(k) Plan (collectively, the 401(k) Plans).

11.    According to the Company, the blackout only prevented participants and beneficiaries from making additional investments in the company's common stock through the 401(k) Plans.

12.    Further, the Company sent a notice to its directors and executive officers informing them that a blackout period would begin on April 6, 2006 and would end at 4:00 pm Central Time on the day on which the Annual Report was filed with the SEC.

13.    The Company's directors and executive officers would generally be prohibited from directly or indirectly acquiring, disposing of, or transferring any equity securities of the company acquired by them in connection with their service and/or employment with the company in such capacities. The notice was allegedly sent to ensure compliance with Section 306(a) of the Sarbanes Oxley Act of 2002.

14.    As of the date of this filing, Navistar has not filed its Annual Report with the SEC.

### NAVISTAR'S STOCK OPTION PLANS

15.    According to a recent press release, Navistar is a holding company whose wholly owned subsidiaries produce International ® brand commercial trucks, MaxxForce brand diesel engines, IC brand school buses, and Workhorse brand chassis for motor homes and step vans. It also is a private-label designer and manufacturer of diesel engines for the pickup truck, van and SUV markets. The company also provides truck and diesel engine parts and services.

16.    According to the Plan document:

> "The purpose of the Plan is to enable the Corporation and its subsidiaries to attract and retain highly qualified Employees, Consultants, and Non-Employee Directors, and additionally to provide key Employees who hold positions of major responsibility the opportunity to earn incentive awards commensurate with the quality of individual performance, the achievement of performance goals and ultimately the increase in shareowner value."

(Ex. A).

17.     An option gives the holder a contractual right to purchase one share of stock (per option) at a set price, called the strike price.  If the stock's market price rises above the strike price, the employee can exercise the option, buying stock at the strike price.  The employee can then sell the stock back at the market price and benefit from the difference.

18.     Employees typically have ten years to exercise their options once they are vested.  After the ten years, the options expire.

19.     According to Navistar's Stock Option Plan, when employees leave Navistar, they have 90 days to exercise his or her options at the strike price, which is determined on the day of the option grant.

20.     Plaintiff and the Class received options pursuant to Navistar's Stock Option Plan.

21.     Navistar's Stock Option Plan provides:

> "The **Committee will document the terms of the Stock Option in an Award Agreement to include the Grant Date and Exercise Price, as well as any other terms that it may desire**. The Exercise Price under a Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the Grant Date. Subject to adjustment pursuant to Section XII, the Exercise Price of outstanding Options fixed by the Committee shall not be modified."

\*\*\*

"Unless otherwise determined by the Committee, a Stock Option granted under the Plan **will become exercisable in whole or in part after the commencement of the second year of the term of the Stock Option** to the extent of one third of the shares, to the extent of one third of the shares after commencement of the third year, and to the extent of one third of the shares after commencement of the fourth year."

\*\*\*

## SUBSTANTIVE ALLEGATIONS

22.    Plaintiff Rawat was the Assistant General Manager of the heavy truck group at Navistar's Cantera facility in Naperville, Illinois.

23.    Throughout the time he was employed by Navistar, he was granted options pursuant to the Stock Option Plan on a yearly basis, starting in 1998.

24.    Mr. Rawat separated from Navistar, effective January 5, 2007, while the "blackout" was in effect.

25.    Navistar's 1994 Performance Incentive Plan (as amended December 11, 2001) provides that the Company can grant two types of options.  Incentive Stock Options, defined as:

"*a right, as evidenced by an agreement between the participant and the Company* in a form approved by the Committee, to purchase a certain number of shares of Common Stock at Fair Market Value for a period of ten (10) years from the date of grant which options are designed to the meet the requirements set out under Section 422 of the Internal Revenue Code."

The Plan also provides for Nonqualified Stock Options, defined as:

"*a right, as evidenced by an agreement between the participant and the Company* in a form approved by the Committee, to purchase a certain number of shares of Common Stock at Fair Market Value for a period of ten (10) years from the date of grant  on which options are stated not to be qualified as incentive stock options under Section 422 of the Internal Revenue Code."

6

The difference between these options is merely the tax treatment between the options, and for purposes of this action, the options – as in the stock option plan[1] – should be treated identically.

26.     At the time of his resignation Mr. Rawat had vested options that, according to the Stock Option Plan, were a contractual right and exercisable within 90 days from the date of his effective resignation.  The 90 days time period ended on April 5, 2007.  The Navistar common stock closed at $48.10.

27.     However, the Company's self-imposed blackout period continued from the time of Mr. Rawat's resignation until the 90 day period ending on April 5, 2007.

28.     During the 90 days between January 5, 2007 and April 5, 2007, Mr. Rawat and his representatives had numerous discussions with Navistar in an attempt for Mr. Rawat to rightfully exercise his vested options.

29.     Ultimately, the Company refused to allow Mr. Rawat to exercise his options and breached the option contract.

30.     The table below shows Mr. Rawat's option status as of his date of resignation:

| Grant Date | Strike Price | No. of Vested Options | Loss as of April 5, 2007 close @ 48.10 |
|---|---|---|---|
| 12/14/1999 | $40.41 | 2900 | $22,311.73 |
| 12/12/2000 | $21.22 | 2133 | $57,335.04 |
| 12/11/2001 | $38.20 | 3300 | $32,670 |
| 12/10/2002 | $26.39 | 3900 | $84,688.50 |
| 12/9/2003 | $42.89 | 1501.5 | $7,830.32 |
| 12/14/2004 | $40.92 | 750.75 | $5,394.14 |
| **Total** | | **14485.25** | **$210,229.73** |

---

[1] The 1994 Stock Option Plan also provides that the term "Stock Option" mean either an Incentive Stock Option or a Nonqualified Stock Option.

31.    The table shows Mr. Rawat's unexercised, yet vested options at the time of his resignation, the strike price of those options, and what the options would have been worth at the end of the 90 days expiration period.

32.    On January 15, 2008, Navistar sent a letter to "Holders of Navistar International Corporation Stock Options." (Ex. B)

33.    The letter stated that "the Company is not current with its financial filing with the Securities and Exchange Commission.  As a result, there are certain limits on your ability to exercise your stock options."

34.    The letter further stated that ". . . some of your stock options may have expired or will expire in the near future.  We plan to address this issue but we are unable to do so now. . . [o]ur plan is to discuss this issue with our Board of Directors.  We cannot predict what, if any, action our directors will take, but we will communicate with you, not matter what the outcome. . ."

## CLASS ALLEGATIONS

35.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

36.    <u>Class Definition</u>.  The proposed class ("the Class") so represented by Plaintiff in this action, and of which the Plaintiff is a member is tentatively defined as:

> All individuals whose vested options expired during Navistar's "blackout period."

<u>The Rule 23(a) Criteria are all met</u>.

37.    <u>Numerosity</u>.  While the exact number of the members of the Class herein defined and described is unknown to Plaintiff at this time, employees whose stock options expired during the blackout period is in the thousands.  The Class is so numerous

that joinder is rendered impracticable.

38.    <u>Commonality</u>.  Questions of law or fact exist arising from the Defendants=

breach of contract and breach of implied duty of good faith and fair dealing.  Such

questions are common to all class members and predominate over any questions

affecting only individual members of the Class.  The myriad of questions of law or fact

common to the Class includes, *inter alia*:

>    (a)    Whether the blackout period was necessary for non-executive
>    employees under the Sarbanes-Oxley Act.
>
>    (b)    Whether Defendants' denial of Plaintiffs' vested contractual right
>    was a breach of contract.
>
>    (c)    Whether Defendants' conduct constituted a breach of the implied
>    duty of good faith and fair dealing.

39.    <u>Typicality</u>.  Plaintiff=s claims are typical of the Class.  Each class member

has suffered damages as a result of the Defendants= conduct.

40.    <u>Adequacy of Representation</u>.  Plaintiff will fairly and adequately protect

the interests of the Class.  Plaintiff=s interest in obtaining declaratory and injunctive

relief for the restrictions on his contractual rights is consistent with and not antagonistic

to the interests of any member of the Class.  Plaintiff is committed to the vigorous

prosecution of this action and his proposed class counsel is experienced in class actions

and complex litigation.

41.    <u>The Rule 23(b) Categories</u>. Additionally, because all employees who have

vested options that expired within the blackout period, common questions predominate

over any individual questions.

**JURY DEMAND**

42.    Plaintiff and the Class demand a jury trial on all issues so triable.

## COUNT I
### Breach of Contract

43.    Plaintiff hereby incorporates all of the foregoing paragraphs.

44.    Plaintiff and the Class and Defendants were parties to Stock Option Agreements pursuant to which Defendants agreed to permit Plaintiff and the Class to purchase Navistar shares of stock before the stock options expired, including a 90 day period after termination of employment.

45.    Plaintiff and the Class performed all conditions, covenants and promises to be performed on their part in accordance with the contracts.

46.    Defendants breached the Stock Option Agreements with Plaintiff and the Class by failing to permit them to exercise their options and purchase shares during the term of the option.

47.    As a result of Defendants' breach of the Stock Option Agreements, Plaintiff and the Class have suffered economic losses and other general, consequential and specific damages, including the amounts they would have received from exercising their stock options.

## COUNT II
### Breach of the Covenant of Good Faith and Fair Dealing

48.    Plaintiff hereby incorporates all of the foregoing paragraphs.

49.    The Stock Option Agreements entered into between Plaintiff and the Class and Defendants are contracts that contain an implied covenant of good faith and fair dealing, which obligated Defendants to perform the terms and conditions of the contracts fairly and in good faith and to refrain from doing any act that would prevent or impede

Plaintiff and the Class from performing any or all conditions of the contracts that they agreed to perform, or any acts that would deprive Plaintiff and the Class of their benefits.

50.    Plaintiff and the Class performed all conditions, covenants and promises to be performed on their part in accordance with the contracts.

51.    Defendants knew Plaintiff and the Class fulfilled all their duties and conditions under the contracts.

52.    Defendants breached the implied covenant of good faith and fair dealing under the contracts by engaging in the conduct complained of herein and by engaging in the conduct that led to the Company's blackout period and thereafter. While the blackout was no fault of the Plaintiff, the Company refused to extend the exercise period beyond the blackout so that Plaintiff could have a meaningful opportunity to exercise their contractual rights conferred upon them by option grants, thereby preventing Plaintiff from exercising their stock options.

53.    As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class have suffered economic losses and other general, consequential and specific damages, including the amounts they would have received from exercising their options.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the Class defined herein, and declaring the

Plaintiff to be a proper Class representative, and Plaintiff's counsel as counsel for the Class;

        B.    Declaring that the Stock Option Plan's 90 day expiration period for former employees is tolled by the blackout period;

        C.    Awarding Plaintiff and Class members compensatory damages and exemplary damages in an amount to be proven at trial;

        D.    Awarding Plaintiff and the Class pre-judgment interest, as well as reasonable fees and costs; and

        E.    Awarding such other relief as this Court may deem just and proper.

Dated: May 23, 2008

                      Respectfully submitted,

                      _____/s/Clinton A. Krislov_____
                      Attorney for the Plaintiff

Clinton A. Krislov
Jeffrey M. Salas
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Dr., Ste. 1350
Chicago, IL 60606
Tel: (312) 606-0500
Fax: (312) 606-0207

Law Offices of Mark Baiocchi
184 Shuman Blvd.
Suite 250
Naperville, IL 60563
Tel: (630) 983-4200
Fax: (630) 983-4223

08CV3038              TG
JUDGE DARRAH
MAGISTRATE JUDGE NOLAN



# NAVISTAR INTERNATIONAL CORPORATION

## 2004 Performance Incentive Plan
## Prospectus and Stock Option Information

**March 24, 2004**

# NAVISTAR INTERNATIONAL CORPORATION
## DOCUMENTS CONSTITUTING A SECTION 10(a) PROSPECTUS PURSUANT TO A FORM S-8 REGISTRATION STATEMENT

### THIS DOCUMENT CONSTITUTES PART OF A PROSPECTUS COVERING SECURITIES THAT HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED

---

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.

---

Solely the information included under Tabs 1.0 through 2.0 shall constitute this prospectus. The information and documentation included under Tab 3.0 shall not, nor shall be construed in any manner to, constitute a part of this prospectus.

---

Neither the delivery of this prospectus nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the company since the date hereof. No person has been authorized to give any information or to make any representations, other than those contained in this prospectus, and, if given or made, such other information or representations must not be relied upon as having been authorized by the company. This prospectus does not constitute an offer to sell or solicitation of an offer to buy by anyone in any jurisdiction in which it is unlawful to make such offer or solicitation.

---

Solely the information contained under Tabs 1.0 through 2.0 constitutes a prospectus covering securities that have been registered under the Securities Act of 1933, as amended.

# PROSPECTUS

### Navistar International Corporation

General Information
Regarding the

### 2004 Performance Incentive Plan

This prospectus describes but does not set forth the terms and conditions of Navistar International Corporation's 2004 Performance Incentive Plan. In the event of any conflict between the terms and conditions of the 2004 Performance Incentive Plan and the information contained in this prospectus, the terms and conditions of the 2004 Performance Incentive Plan shall prevail. No person has been authorized to give any information or to make any representations other than those contained in this prospectus in connection with the 2004 Performance Incentive Plan and the offering described in this prospectus, and if given or made, such other information or representations may not be relied upon as having been authorized by Navistar International Corporation.

**This document constitutes part of a prospectus covering securities that have been registered under the Securities Act of 1933, as amended.**

**The date of this prospectus is March 24, 2004**

# TABLE OF CONTENTS

| | Page |
|---|---|
| Introduction | -1- |
| What is the Company's purpose in providing the 2004 Plan? | -2- |
| Who is eligible to participate in the 2004 Plan? | -2- |
| How do I benefit under the 2004 Plan? | -2- |
| What does an Award consist of under the 2004 Plan? | -2- |
| What are the general terms of my Award under the 2004 Plan? | -3- |
| Will the Company provide me periodic reports concerning my Awards under the 2004 Plan? | -6- |
| How do I exercise my Award and pay for the shares that I buy under the 2004 Plan? | -6- |
| Can I sell or transfer my Award to someone else? | -6- |
| Can I sell the shares I acquire by exercising my Award? | -7- |
| Can the Company reprice or discount stock options granted under the 2004 Plan? | -8- |
| How would my Award be affected by a future change in the capitalization of the Company? | -8- |
| How would my restricted stock, stock units and stock options be treated in the event of a change in control of the Company? | -8- |
| Does the grant of an Award or ownership of shares give me any special rights? | -8- |
| Under what circumstances can the 2004 Plan or my Award Agreement be modified or termination? | -9- |
| What exactly is the Restoration Stock Option program and how does it work? | -9- |
| What is the Federal Income Tax treatment of an Award? | -9- |
| Risk Factors and Certain Investment Considerations | -12- |
| Additional Information. | -13- |

This prospectus provides information concerning awards granted under the Navistar International Corporation 2004 Performance Incentive Plan (the "2004 Plan"), primarily in question and answer format. The information contained herein is qualified in its entirety by the text of the 2004 Plan.

## Introduction.

*Principal Office and Telephone Number.* The principal executive office of Navistar International Corporation (the "Company") is located at 4201 Winfield Road, Warrenville, Illinois 60555, and the Company's telephone number is (630) 753-5000.

*The 2004 Performance Incentive Plan.* The 2004 Plan was approved by the Board of Directors (the "Board") and the independent Compensation and Governance Committee (the "Committee") of the Company on October 21, 2003 and by the shareowners of the Company on February 17, 2004. A total of 3,250,000 shares of Common Stock of the Company are reserved for awards under the 2004 Plan. As of February 17, 2004, no awards have been made in respect of any shares of Common Stock reserved for issuance under the 2004 Plan. The 2004 Plan replaces the Company's 1994 Performance Incentive Plan (which expired December 16, 2003), the 1998 Supplemental Stock Plan and accompanying Restoration Stock Option Program (which both expired on December 16, 2003) and the 1998 Non-Employee Director Stock Option Plan (which the Company terminated on February 17, 2004). The 2004 Plan expires on February 16, 2014. The 2004 Plan is governed by and interpreted in accordance with the laws of the State of Delaware. Any cause of action a participant may have in respect of the 2004 Plan must be brought within the three year period set forth in the 2004 Plan or such claim will be barred in accordance with the terms and conditions of the 2004 Plan.

The number of shares authorized and available for issuance under the 2004 Plan will be increased by shares of stock subject to an option or award under the 2004 Plan, or any other plan, including, the 1994 Performance Incentive Plan, the 1998 Supplemental Stock Plan or the 1998 Non-Employee Director Stock Option Plan, that is cancelled, expired, forfeited, settled in cash or otherwise terminated without a delivery of shares to the participant of such plan, including shares used to pay the stock option exercised price of a stock option issued under the 2004 Plan or any other plan or to pay taxes with respect to such stock option.

Unless otherwise specified, a reference herein to the "2004 Plan" refers to the 2004 Performance Incentive Plan. Awards granted under the 2004 Plan may consist of annual incentive awards, stock options, restricted stock, stock units, stock appreciation rights or any other type of award granted by the Committee under the 2004 Plan and such awards may herein after be referred to as an "Award" or collectively as "Awards."

*Administration.* The 2004 Plan is administered by the Committee. All Committee members are non-employee directors of the Company and are appointed to the Committee by the Board for a one-year term and may be removed by the same. All decisions of the Committee will be final, conclusive and binding upon all parties. In administering the 2004 Plan, the Committee's discretionary authority includes, without limitation, determinations as to (1) the approval of participants in the plan, (2) the amount and nature of the Awards and (3) the performance levels at which different percentages of the Awards would be earned and adjusted. For further information about the 2004 Plan, please refer to the 2004 Plan or contact the Company's Corporate Secretary at the Company's principal executive office.

*ERISA and Certain Tax Provisions Not Applicable.* The 2004 Plan is not subject to any provisions of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") and is not qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code").

## What is the Company's purpose in providing the 2004 Plan?

The purpose of the 2004 Plan is to enable the Company and its subsidiaries to attract and retain highly qualified personnel and non-employee directors, and additionally to provide key employees who hold positions of major responsibility in the Company the opportunity to earn incentive awards commensurate with the quality of individual performance, the achievement of performance goals and ultimately the increase in shareowner value.

## Who is eligible to participate in the 2004 Plan?

Management will, from time to time, select and recommend to the Committee employees of the Company and its subsidiaries who are to become participants in the 2004 Plan. Such individuals will be selected from those who, in the opinion of management, have substantial responsibility in a managerial or professional capacity. Non-employee directors are also eligible to participate in the 2004 Plan. Non-employee directors participating in the 2004 Plan shall be limited to receiving Awards of non-qualified stock options, restricted stock and stock units under the 2004 Plan.

## How do I benefit under the 2004 Plan?

You benefit by an Award of cash or stock-based compensation under the 2004 Plan. The grant of a stock-based Award gives you the opportunity to benefit from possible appreciation in the market price of the Company's Common Stock.

## What does an Award consist of under the 2004 Plan?

Under the 2004 Plan, the Committee may award: (1) annual incentive awards to participants, consisting of awards of cash approved by the Committee based on the level of achievement attained against annual performance goals approved by the Committee within the first ninety days of the applicable fiscal year; (2) stock option awards to employee participants, consisting of either nonqualified stock options or incentive stock options; (3) non-qualified stock option awards to non-employee director participants; (4) restricted stock awards to participants; (5) stock unit awards to participants; (6) stock appreciation right awards to employee participants, whether granted in connection with a related stock option or independent thereof; (7) any other type of Award granted by the Committee under the 2004 Plan; or (8) any combination of the foregoing Awards. All such Awards may be made, subject to the terms of the 2004 Plan, in such amounts (if any) and at such times (if at all) as the Committee may approve; provided, however, that in order to provide a limitation on the number of shares of Common Stock of the Company that may be issued in respect of a particular Award under the 2004 Plan, no more than 1,000,000 shares of Common Stock of the Company may be granted as stock options, restricted stock, stock units, SARs or any other Award under the 2004 Plan; provided, further, that such limitation shall not apply to any Award which is a non-qualified stock option granted to non-director employee participants.

2

**What are the general terms of my Award under the 2004 Plan?**

*General.* The principal terms of your Award will be contained in an award agreement between you and the Company (an "Award Agreement"), which you will enter into, upon the grant to you by the Company of an Award under the 2004 Plan. These terms will include the general nature of the Award, including the number of shares subject to each Award (in the case of a stock-based Award), the number of Awards granted to you, the date each Award is granted and other terms and conditions not expressly provided for in the 2004 Plan.

*Annual Incentive Awards.* If your Award is an annual incentive award, you will be eligible to receive a cash payment from the Company based upon the performance measures (as defined in the 2004 Plan) established by the Committee and set forth in your Award Agreement within the first ninety days of the applicable fiscal year. Only employee participant under the 2004 Plan are eligible to receive annual incentive awards and no participant who is not an employee at the end of the Company's fiscal year shall be entitled to such Award unless the Committee determines otherwise. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your annual incentive award.

*Stock Options.* If your Award is a stock option, the Committee will have the authority to determine certain terms relating to your stock option, including the grant date, the exercise price (which will be the fair market value of the stock on the date of grant of the stock option, as determined by the Committee), the exercise period, the number of shares that may be exercised at any given time, when you may exercise your stock option, any conditions to the exercise of your stock option, any restrictions on your right to sell the shares you purchase through the exercise of your stock option and whether the stock option is intended to be an incentive stock option under Section 422 of the Code. (Please remember that non-employee director participants are not eligible to receive incentive stock option Awards under the 2004 Plan.) Unless otherwise determined by the Committee and set forth in your Award Agreement, stock options granted to participants under the 2004 Plan will become exercisable in whole or in part as follows: after the commencement of the second year of the term of the stock option, to the extent of one third of the shares; after the commencement of the third year of the stock option, to the extent of one third of the shares; and after commencement of the fourth year of the stock option, to the extent of one third of the shares. Generally, except as otherwise provided in the 2004 Plan (see discussion regarding death, total and permanent disability or qualified retirement below), no outstanding stock option may be exercised by a participant unless such participant is an employee or non-employee director of the Company, as the case may be, at the time of exercise; provided, however, that in the event of termination of such relationship (other than on account of death, total and permanent disability or qualified retirement), such participant may exercise the stock option at any time within three months after such termination (but not after the expiration of the term of the grant) to the extent of the number of shares which were exercisable at the date of such termination; provided, further, that with respect to any employee participant, if such employee participant is terminated for cause as defined the International Truck and Engine Corporation Income Protection Plan or if the employee participant is covered by a different severance plan or agreement, then as defined in such plan or agreement, the three-month period shall not apply and the stock option shall cease to be exercisable and shall lapse as of the effective date of such employee participant's termination.

3

You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your stock option.

*Restricted Stock.* If your Award is restricted stock, you will receive shares of Common Stock of the Company that are restricted with an appropriate legend as to sale or transfer and subject to forfeiture pursuant to terms established by the Committee at the time of issuance. You will be entitled to all dividends paid with respect to all restricted stock granted to you under the 2004 Plan and you will be entitled to vote all such restricted stock granted to you under the 2004 Plan. Restricted stock may be granted to employee participants under the 2004 Plan for meeting their stock ownership requirements as described in the Company's Executive Stock Ownership Program, as amended from time to time (the "ESOP"), or for any other purpose. Restricted stock shall vest, in full or in installments, upon satisfaction of the conditions specified in your Award Agreement. In no event will an Award of restricted stock granted under the 2004 Plan vest in full prior to the commencement of the third anniversary of the grant date. A participant who quits or is involuntarily separated from the Company will forfeit any unvested restricted stock granted under the 2004 Plan. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your restricted stock grant.

*Stock Units.* If your Award is stock units, you will receive without payment units representing shares of Common Stock of the Company. Such units will be restricted as to sale or transfer and subject to forfeiture pursuant to terms established by the Committee at the time of issuance. You will not be entitled to any dividends paid with respect to such stock units granted to you under the 2004 Plan and you will not be entitled to vote any such stock units granted to you under the 2004 Plan until such time as your stock units are converted into shares of Common Stock of the Company. Stock units may be granted to employee participants under the 2004 Plan for meeting their stock ownership requirements as described in the ESOP, or for any other purpose. Stock units shall vest, in full or in installments, upon satisfaction of the conditions specified in your Award Agreement. At the time that you leave the Company, you will receive such number of shares of unrestricted Common Stock of the Company equivalent to the number of vested stock units held by you as of such date (see the discussion regarding death, total and permanent disability or qualified retirement below). In no event will an Award of stock units granted under the 2004 Plan vest in full prior to the commencement of the third anniversary of the grant date. A participant who quits or is involuntarily separated from the Company will forfeit any unvested stock units granted under the 2004 Plan. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your stock units.

*Stock Appreciation Rights or SARs.* If your Award is a stock appreciation right or SAR, the Committee will have the authority to determine certain terms relating to your SAR, including the grant date, the exercise price (which will be, for freestanding SARs, the fair market value of one share of Common Stock of the Company on the date of the grant of the SAR, as determined by the Committee, and for a SAR granted in tandem with a stock option, it will be the exercise price of the related stock option), the exercise period of the SAR (which shall not exceed a term of 10 years), the number of SARs that may be exercised at any given time, when you may exercise your SAR and any conditions to the exercise of your SAR. Upon the exercise of a SAR, you shall be entitled to receive payment in an amount equal to the excess of the fair market value of one share of Common Stock of the Company on the date of exercise over the exercise price of the SAR, multiplied by the number of shares of Common Stock of the Company for which the SAR is exercised. At the discretion of the Committee, the payment due to you upon exercise of the SAR may be in cash, Common Stock of the Company or any combination thereof. Please

4

remember that non-employee director participants are not eligible to receive SARs under the 2004 Plan. You should refer to the 2004 Plan and to your Award Agreement for additional information about the terms of your SARs.

*Death, Total and Permanent Disability or Qualified Retirement.* In the case of outstanding stock options, if a participant (i) dies, the stock option may be exercised by a legatee, or by the personal representatives or distributees of such participant at any time within a period of two years after such participant's death, but not after the expiration of the term of the stock option grant, (ii) becomes total and permanently disabled (as defined under the Company's long term disability programs for employee participants or as determined by the Committee for non-employee director participants), such participant may exercise the stock option (to the extent it is or becomes exercisable under its terms) at any time within three years after termination or, if later, the date on which the stock option becomes exercisable with respect to such shares, but not after expiration of the term of the stock option grant, or (iii) retires pursuant to a qualified retirement (as defined in the 2004 Plan), such participant may exercise the stock option (to the extent it is or becomes exercisable under its terms) at any time during the term of the stock option grant; provided, however, that no stock option which is not exercisable at the time of qualified retirement shall become exercisable after such qualified retirement if, without the written consent of the Company, such participant engages in a business which is competitive to the business of the Company or its affiliates.

In the case of restricted stock or stock units, if a participant (i) dies while serving the Company or following a total and permanent disabled or qualified retirement, any such previously granted restricted stock or stock units shall vest as of the date of such participant's death and all restrictions thereon shall lapse and the restricted stock or stock units shall be immediately transferable to the name beneficiary or to such participant's estate, (ii) becomes totally and permanently disability or retires from the Company, such restricted stock or stock units will continue to vest according to the terms of grant or (iii) otherwise terminates employment (in the case of an employee participant) or service (in the case of a non-employee director participant), then any restricted stock or stock units not vested as of such date will be forfeited to the Company.

*Award Expiration Date.* The expiration date of your Award will be specified in your Award Agreement. The expiration date for incentive stock options and stock appreciation rights shall be no more than ten years from the date of grant. The expiration date for nonqualified stock options shall be no more than ten years from the date of grant. The effective date of the grant of a stock option will be, unless the Committee expressly determines otherwise, the business day on which the Committee approves the grant of such stock option.

*Charges and Deductions.* No charges or deductions (aside from tax or other withholdings) may be made against a participant of the 2004 Plan, or against the securities or assets of the 2004 Plan, nor may any lien be created against any of the funds, securities or other property held by participants under the 2004 Plan.

**Will the Company provide me periodic reports concerning my Awards under the 2004 Plan?**

Although no participant will be provided with periodic or other reports concerning the status of their accounts under the 2004 Plan, the Company will supply information to such participants in response to inquiries addressed to the Corporate Secretary of the Company.

**How do I exercise my Award and pay for the shares that I buy under the 2004 Plan?**

*General.* The Committee has the authority to determine the procedures you must follow to exercise your Award and pay for any shares you acquire under the 2004 Plan. The following description of payment procedures is qualified in its entirety by reference to the 2004 Plan for a full description of such procedures:

*Withholding Taxes.* Subject to certain limitations, including limitations applicable to officers and directors subject to Section 16(b) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), a participant may elect to pay any withholding tax due on an Award granted pursuant to the 2004 Plan either in cash (including a personal check), or by delivery at "fair market value" (as defined in the 2004 Plan) of unrestricted Common Stock already owned by such participant, or by a combination of the foregoing. In addition, a participant settling an Award granted pursuant to the 2004 Plan may elect to have the Company withhold a portion of the shares of Common Stock of the Company otherwise to be issued upon settlement of the Award equal in value to the minimum required withholding taxes.

*Exercise Price of Stock Options.* Stock options can be exercised in whole or in part through cashless exercises or other arrangements through agents (including stock brokers) established by the Company by paying the amounts required by instructions issued by the Company's Corporate Secretary. If an exercise is not covered by such instructions, the purchase price, subject to certain limitations, is to be paid in full to the Company upon exercise of a stock option either in cash (including a personal check), or by delivery at "fair market value" of unrestricted Common Stock already owned by such participant (which Common Stock, if acquired from the Company, must have been held for at least six months), or by a combination of the foregoing. In no event may successive simultaneous pyramiding be used to exercise a stock option.

*Other Limitations on Exercise.* Before you can exercise your Award, the Committee must be satisfied that such exercise will not violate any securities laws or other law or requirement of any government authority.

**Can I sell or transfer my Award to someone else?**

Awards under the 2004 Plan may not be assigned or alienated. In case of a participant's death, the amounts distributable to the deceased participant under the 2004 Plan with respect to which a designation of beneficiary has been made (to the extent it is valid and enforceable under applicable law) shall be distributed in accordance with the 2004 Plan to the designated beneficiary or beneficiaries. The amount distributable to a participant upon death and not subject to such a designation shall be distributed to such participant's estate. If there is any question as to the right of any beneficiary to receive a distribution under the 2004 Plan, the amount in question may be paid to the estate of such participant, in which event the Company will have no

further liability to anyone with respect to such amount.

**Can I sell the shares I acquire by exercising my Award?**

*General.* Any shares of Common Stock of the Company you acquire under the 2004 Plan, including shares acquired by exercising your right to purchase shares under your Award, can be sold or transferred only as permitted by the 2004 Plan and/or your Award Agreement and subject to any securities law restrictions.

*Securities Law Restrictions.* The Company filed a registration statement under the Securities Act of 1933, as amended (the "Securities Act"), which became effective on March 24, 2004 (the "Effective Date"), pursuant to which the Company registered the Common Stock issued after the Effective Date to participants under the 2004 Plan (the "Registration Statement"). Subject to the terms of the 2004 Plan and applicable Award Agreements, participants who are not Affiliates (as defined below) of the Company and who acquire the Common Stock under the 2004 Plan after the Effective Date generally will be entitled to resell such Common Stock in the public market without restrictions under the Securities Act. An "Affiliate" of an entity is defined in Rule 144 under the Securities Act as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with" such entity. An employee of the Company who is not an executive officer or director of the Company generally would not be deemed to be an Affiliate of the Company.

Resales by participants who are Affiliates of the Company or who acquired Common Stock under the 2004 Plan prior to the Effective Date of the Registration Statement are not covered by this prospectus (such participants are herein collectively referred to as "Restricted Participants"). Resales by such Restricted Participants are subject to certain restrictions under the Securities Act. An Affiliate of the Company may not offer or resell any shares of Common Stock acquired by them under the 2004 Plan (whether acquired before or after the Effective Date of the Registration Statement) unless the offer and resale of such shares are registered by the Company under the Securities Act or unless an exemption from registration is available. Participants who acquired shares of Common Stock under the 2004 Plan prior to the Effective Date of the Registration Statement (such shares being herein referred to as "Subject Shares") may not offer or resell the Subject Shares unless the offer and resale of the Subject Shares are registered by the Company under the Securities Act or unless an exemption from registration is available. In the absence of an effective registration statement, Affiliates may resell the Common Stock acquired under the 2004 Plan and participants holding Subject Shares may resell such Subject Shares only by complying with the requirements and limitations of Rule 144 under the Securities Act or other available exemption. Under Rule 144 offers or resales by Restricted Participants may be made without registration under the Securities Act where certain limitations are met as to the number of shares which may be sold over specified periods of time, the selling price thereof, the manner in which sales may be made and the minimum period of time which the shares must have been held (except that the holding period will not be applicable to Affiliates with respect to Common Stock acquired by them under the 2004 Plan after the Effective Date of the Registration Statement).

Executive officers and directors of the Company and holders of 10% or more of the outstanding Common Stock are also subject to the provisions of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder, which, among other things, permit recovery by or on behalf of the Company of so-called "short-swing" profits arising from

purchases and sales (or sales and purchases) of the Common Stock by such persons within any six-month period.

The foregoing is not intended to be a complete statement of applicable law, and participants, particularly executive officers and directors of the Company, should consult their own counsel for information regarding restrictions on resale of the Common Stock acquired pursuant to the 2004 Plan under the Securities Act and the Exchange Act.

## Can the Company reprice or discount stock options granted under the 2004 Plan?

No stock option issued under the 2004 Plan may be amended or modified in any way that changes the exercise price of the stock option, and no stock option may be issued with an exercise price that is less than the fair market value (as defined in the 2004 Plan) of one share of the Common Stock of the Company on the grant date of the stock option, or in any other way discounted. Such limitation, however, shall not apply to any future changes in the capitalization of the Company as discussed below.

## How would my Award be affected by a future change in the capitalization of the Company?

The Award Agreements may contain such provisions as the Committee may determine to be appropriate for the adjustment of the number and class of shares subject to each outstanding stock option or SAR, the exercise price in the event of changes in, or distributions with respect to, the outstanding Common Stock of the Company by reason of stock dividends, recapitalizations, mergers, consolidations, split-ups, combinations or exchanges of shares, spinoffs and the like.

## How would my restricted stock, stock units and stock options be treated in the event of a change in control of the Company?

In the event of a "Change in Control" (as defined the 2004 Plan) all awarded restricted stock and stock units will immediately be free of all restrictions and fully earned, and all outstanding stock options will be immediately exercisable and shall continue to be exercisable for a period of three years from the date of the Change in Control regardless of the original term or employment status (except that the term of any incentive stock option shall not be extended beyond ten years from the date of grant).

## Does the grant of an Award or ownership of shares give me any special rights?

Neither the grant of an Award by the Company nor ownership of shares by you obligates the Company or any of its subsidiaries to retain you as an employee, officer or director. The Company and its subsidiaries reserve the same right to terminate your employment or service as existed before the establishment of the 2004 Plan or the grant of any Awards under the 2004 Plan.

The grant of an Award of a stock option or stock unit does not give you any rights of a shareowner of the Company with respect to the shares covered by your Award until you actually own the shares. The grant of an Award of restricted stock will during the period of restriction

8

entitle you to all dividends paid with respect to such restricted stock and to vote such restricted stock.

**Under what circumstances can the 2004 Plan or my Award Agreement be modified or terminated?**

Under the terms of the 2004 Plan, the Committee may modify, amend, or terminate the 2004 Plan at any time; provided, however, that unless the requisite approval of the shareowners of the Company is obtained, no amendment shall be effective if such amendment would (i) increase the number of shares of Common Stock of the Company available for issuance under the 2004 Plan or increase the limits applicable to Awards under the 2004 Plan (except as in the case of a change in the capitalization of the Company as discussed above), (ii) lower the exercise price of a stock option or SAR grant value below 100% of the fair market value of one share of Common Stock of the Company on the grant date (except as in the case of a change in the capitalization of the Company as discussed above), (iii) remove the repricing restrictions set forth in the 2004 Plan, or (iv) require shareowner approval as a matter of law or under rules of the New York Stock Exchange. No 2004 Plan amendment shall, without the affected participant's consent, terminate or adversely affect any right or obligation under any Award previously granted under the Plan. The Committee may terminate the 2004 Plan at any time.

**What exactly is the Restoration Stock Option program and how does it work?**

The Restoration Stock Option program is a feature of the 2004 Plan available to employee participants who have been granted a non-qualified stock option under the 2004 Plan. In essence, the Restoration Stock Option program allows employee participants to exercise vested non-qualified stock options by presenting shares of Common Stock of the Company that (1) either (i) have been held for at least six months if such shares were obtained from the Company or (ii) have been purchased in the open market and (2) have a total market value equal to the exercise price of the stock option times the number of stock options being exercised. To account for the withholding of federal, state and local income taxes and Social Security taxes liabilities on the stock option gain, shares of Common Stock may be withheld from the stock option exercise. Restoration stock options are then granted to the employee participant at the market price of the Common Stock of the Company in an amount equal to the number of mature shares of Common Stock of the Company that were used to exercise the original stock option, plus the number of shares of Common Stock of the Company that are withheld for the tax liability on the stock option gain. For more information on this subject, please refer to the 2004 Plan.

**What is the Federal Income Tax treatment of an Award?**

*The following is a brief summary of the principal federal income tax consequences to participants in the 2004 Plan and does not purport to address all aspects of Federal income tax treatment. You should consult your tax advisor because the specific federal, state and local tax treatment will vary depending upon your individual circumstances. In addition, the following discussion is limited to United States federal income tax laws applicable to participants who are both citizens and residents of the United States. The United States federal income tax treatment of Awards granted to a participant who is not both a citizen and resident of the United States may differ. The tax laws of other countries may provide for different tax consequences to*

9

*participants who are subject to such laws. In addition, the tax laws of the United States are subject to change and such changes could apply retroactively.*

    *Annual Incentive Awards.* Annual incentive awards granted under the 2004 Plan would generally be taxable to you as ordinary income in the year paid. The current maximum federal income tax rate for ordinary income is 35%. The Company is generally entitled to a deduction for any compensation taxed to you as ordinary income.

    *Stock Options.* Stock options granted under the 2004 Plan may be either nonqualified stock options ("NQOs") or Incentive Stock Options ("ISOs") for federal income tax purposes; provided, however, that non-employee director participants are not eligible to receive ISOs under the 2004 Plan.

    *NQOs.* Generally, if you are awarded a NQO you do not recognize any taxable income for federal income tax purposes at the time of grant. Upon exercise of your NQO, the excess of the fair market value of the Common Stock of the Company on the date of exercise over the NQO exercise price will be taxable to you as ordinary income. You will have a capital gain (or loss) upon the subsequent sale of the Common Stock of the Company in an amount equal to the sale price reduced by the fair market value of the Common Stock of the Company on the date you exercised your NQO. The holding period for purposes of determining whether the capital gain (or loss) is a long- or short-term gain (or loss) will commence on the date you exercise your NQO. The capital gain will be long-term or short-term depending on whether you have held the shares of Common Stock you acquired upon the exercise of your NQO for more than one year after the exercise date. Short-term capital gains are generally subject to the same federal income tax rate as ordinary income (the current maximum rate is 35%), while long-term capital gains are generally subject to a maximum rate of 15%. The Company is generally entitled to a deduction for any compensation taxed to you as ordinary income.

    *ISOs.* If the stock option is intended to qualify as an ISO, the Award Agreement will state it is for an ISO. If you are awarded an ISO you do not recognize any taxable income for federal income tax purposes at the time of grant or exercise. If you hold the stock for the ISO holding periods of two years from the date of the grant and one year from the date of exercise, and if you exercise the stock option while you are employed by the Company or within three months of termination of employment, any gain realized on the sale (measured by the difference between the stock option price paid for the stock and the amount received on the sale), will be taxed as capital gain. If the stock was held for the long-term capital gain holding period, which is currently more than one year from the date of exercise, the capital gain will be long-term gain eligible for the maximum 15% rate. If the stock is disposed of before the expiration of the ISO holding periods, you will recognize ordinary income to the extent the value of the stock on the date of exercise exceeds the stock option exercise price and the Company will generally be entitled to take a deduction for such amount. Upon exercise of your ISO, the excess of the fair market value of the shares you acquire over the exercise price of the stock option will be included in your alternative minimum taxable income and may cause or increase a liability for alternative minimum tax. There is an annual $100,000 limitation on the amount of stock options that can qualify as ISOs. Each calendar year is tested separately. All stock options held by an employee that first become exercisable in the year are tested. Stock options cannot qualify as ISOs to the extent that the value of the stock covered by

the stock options exceeds $100,000. The value of the stock for this purpose is the value of the stock on the date of the grant of the stock option.

*Effect of Section 16(b) of the Exchange Act.* The tax consequences upon the exercise of either NQOs or ISOs may vary for those directors and executive officers who are subject to liability under Section 16(b) of the Exchange Act. In general, such participants will not recognize income on the Common Stock acquired under the 2004 Plan until they are no longer subject to liability under Section 16(b) with respect to the disposition of such Common Stock. However, a participant may elect to be taxed based on the fair market value of the shares on the exercise date (and have a holding period beginning on the exercise date) by filing an election under Section 83(b) of the Code within thirty days of the exercise date. If such participant later sells such shares, he or she will recognize capital gain or loss on the difference between the selling price and the exercise price.

*Restricted Stock.* If you are awarded Common Stock of the Company that is subject to restrictions on transfer and is subject to a "substantial risk of forfeiture" as defined in Section 83 of the Code, you may make a Section 83(b) election to have your Award taxed as ordinary income at the time of grant on the excess of the fair market value of the shares on the grant date over the amount you paid for the shares. If you do not make a timely Section 83(b) election, the Award will generally be taxed as ordinary income at the date(s) that the restrictions creating the risk of forfeiture expire. The amount of tax on each such date will equal the fair market value of such shares on such date less the amount paid by you for the shares. During any period when a participant is subject to liability under Section 16(b) of the Exchange Act with respect to the disposition of Common Stock acquired under the 2004 Plan, such Common Stock is treated as subject to a restriction on transfer and a substantial risk of forfeiture. The Company is generally entitled to a deduction for any compensation taxed to you as ordinary income.

*Stock Units.* If you are awarded stock units under the 2004 Plan you generally would have no federal income tax consequence at the time of grant. At the time your stock units are converted into unrestricted shares of Common Stock of the Company (i.e., the shares are not subject to a "substantial risk of forfeiture"), then, at such time, you will generally recognize ordinary income to the extent of the excess of the fair market value of the stock on the date of conversion over the cost for such stock, if any. The Company is generally entitled to a deduction at the time and in the amount taxed to you as ordinary income.

*SAR and Other Awards.* If you are awarded stock appreciation rights under the 2004 Plan you generally would have no federal income tax consequence at the time of grant. Upon exercise of the SAR, the amount of cash or other property received by you will generally be subject to ordinary income tax in the year of receipt and the Company will generally be entitled to a deduction at the time and in the amount taxed to you as ordinary income.

*Withholding Taxes.* Because the amount you realize upon the exercise of your Award may be treated as compensation subject to applicable withholding or federal, state and local income taxes and Social Security taxes, the Company or one of its subsidiaries may make other arrangements with you to pay the amount required to be withheld by the Company or such subsidiary before delivering any shares to you purchased under the 2004 Plan. These arrangements may include withholding the amount of any withholding or other tax due and/or withholding a certain number of shares issuable under the 2004 Plan. The Company will defer

delivery under your Award until arrangements are made to its satisfaction with respect to withholding and other taxes.

## Risk Factors and Certain Investment Considerations.

This prospectus and the information incorporated by reference in this prospectus may include forward-looking statements within the meaning of Section 27A of the Securities Act, Section 21E of the Exchange Act, and the Private Securities Litigation Reform Act of 1995 that are subject to risks and uncertainties. You should not place undue reliance on those statements because they are subject to numerous uncertainties and factors relating to our operations and business environment, all of which are difficult to predict and many of which are beyond our control. Such forward-looking statements only speak as of the date of this prospectus and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date on which the statement is made or to reflect the occurrence of unanticipated events. Forward-looking statements include information concerning our possible or assumed future results of operations, including descriptions of our business strategy. These statements often include words such as "believe," "expect," "anticipate," "intend," "plan," "estimate" or similar expressions. These statements are based on assumptions that we have made in light of our experience in the industry as well as our perceptions of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the circumstances. As you read and consider this prospectus, you should understand that these statements are not guarantees of performance or results. They involve risks, uncertainties and assumptions. Although we believe that these forward-looking statements are based on reasonable assumptions, you should be aware that many factors could affect our actual financial results or results of operations and could cause actual results to differ materially from those in the forward-looking statements. Some of these factors include:

- The markets in which we compete are subject to considerable cyclicality.

- We operate in the highly competitive North American truck market.

- Our business may be adversely impacted by work stoppages and other labor relations matters.

- The loss of business from Ford Motor Company, or "Ford," our largest customer, could have a negative impact on our business, financial condition and results of operations.

- The costs associated with complying with environmental and safety regulations could lower our margins.

- Our liquidity position may be adversely affected by a continued downturn in our industry.

- Our business could be negatively impacted in the event Navistar Financial Corporation, our financing subsidiary, is unable to access sufficient capital to engage in its financing activities.

- We have significant underfunded postretirement obligations.

- Our manufacturing operations are dependent upon third-party suppliers, making us vulnerable to a supply shortage.

- Our ability to use net operating loss carryovers to reduce future tax payments if there is a change in ownership of the Company.

- We are exposed to political, economic and other risks that arise from operating a multinational business.

- Our substantial debt could require us to use a significant portion of our cash flow to satisfy our debt obligations and may limit our operating flexibility.

Other factors and assumptions not identified above are also relevant to the forward-looking statements, and if they prove incorrect, could also cause actual results to differ materially from those projected. For a further and more detailed description of these factors, please refer to Exhibit 99.1 to our Form 10-K. Participants should carefully consider all of these factors before making an investment in the stock offered under the 2004 Plan.

In addition, the market price of our Common Stock may fluctuate from time to time. For this reason, the value of any stock-based Awards granted under the 2004 Plan may decrease or increase in value depending upon the market price of our Common Stock.

**Additional Information.**

The Company is subject to the informational requirements of the Exchange Act and files reports and other information with the Securities and Exchange Commission (the "Commission"). Such reports and information can be inspected and copied at the public reference facility maintained by the Commission located at 450 Fifth Street, N.W., Room 1024, Washington, D.C. 20549. Please call the Commission at 1-800-SEC-0330 for further information on the public reference room. Copies of such material can also be accessed electronically by means of the Commission's home page on the Internet at www.sec.gov. Our Common Stock is listed on the New York Stock Exchange, The Chicago Stock Exchange and The Pacific Exchange, and such reports and other information can also be inspected and copied at the offices of the New York Stock Exchange, Inc., at 20 Broad Street, New York, NY 10005, the Chicago Stock Exchange, Inc., at One Financial Plaza, 440 South LaSalle Street, Chicago, IL, 60605, and the Pacific Exchange, Inc., at 301 Pine Street, San Francisco, CA, 94104.

This prospectus constitutes part of the Registration Statement filed with the Commission. The Registration Statement and this prospectus incorporate by reference certain documents, including the Company's Annual Report on Form 10-K and all documents subsequently filed by the Company with the Commission under the Exchange Act. These documents, as well as other documents required to be delivered to you upon your request pursuant to Rule 428(b) of the Securities Act, will be provided to you without charge upon your written or oral request. In general, Rule 428(b) requires that participants receive, concurrently with this prospectus, a copy of either the Company's latest annual report to shareowners, Annual Report on Form 10-K or prospectus containing audited financial statements, and that you receive annually copies of all reports, proxy statements and other materials distributed to shareowners. Requests for any of these documents should be directed to the Company, 4201 Winfield Road, Warrenville, Illinois 60555 Attention: Corporate Secretary (telephone number (630) 753-5000).

The information in this prospectus will be updated regularly by a supplement, a revised prospectus or by including information in the most recent annual report to shareowners or the most recent proxy statement of the Company. If a significant period of time has elapsed from the date of publication of this prospectus, you should obtain and refer to all supplements. If you receive a supplement after you receive this prospectus, you should keep it with this prospectus and refer to it whenever you refer to this prospectus.

# NAVISTAR INTERNATIONAL CORPORATION

## 2004 PERFORMANCE INCENTIVE PLAN

### SECTION I

### ESTABLISHMENT OF THE PLAN

The Board of Directors of Navistar International Corporation approved the establishment of the Navistar International Corporation 2004 Performance Incentive Plan ("Plan") on October 21, 2003, subject to approval by the Stockholders at the Corporation's annual meeting to be held on February 17, 2004, or any adjournment thereof. The Plan replaces the Navistar 1994 Performance Incentive Plan and the Navistar 1998 Supplemental Stock Plan, each of which terminate December 16, 2003 under the terms of the plans, and the Plan will replace and supercede the Navistar 1988 Non-Employee Directors Stock Option Plan.

### SECTION II

### PURPOSE OF THE PLAN

The purpose of the Plan is to enable the Corporation and its subsidiaries to attract and retain highly qualified personnel and non-employee directors, and additionally to provide key employees who hold positions of major responsibility the opportunity to earn incentive awards commensurate with the quality of individual performance, the achievement of performance goals and ultimately the increase in shareowner value.

### SECTION III

### DEFINITIONS

For the purposes of the Plan, the following words and phrases shall have the meanings described below in this Section III unless a different meaning is plainly required by the context.

(1) "Annual Incentive Award" means an award of cash determined by the Committee after the end of the Fiscal Year.

(2) "Award" means an award made under the Plan.

(3) "Award Agreement" means an agreement entered into by the Corporation and a Participant setting forth the terms and provisions applicable to an Award granted to a Participant.

(4) "Board of Directors" means the Board of Directors of Navistar International Corporation.

(5) "Change in Control" shall be deemed to have occurred if (i) any "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934), other than employee or retiree benefit plans or trusts sponsored or established by the Corporation or International Truck and Engine Corporation, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934), directly or indirectly, of securities of the Corporation representing 25% or more of the combined voting power of the Corporation's then outstanding securities, (ii) the following individuals cease for any reason to constitute more than three-fourths of the number of directors then serving on the Board of Directors of the Corporation: individuals who, on the date hereof, constitute the Board and any new director (other than a director whose initial assumption of office is in connection with an actual or threatened election contest, including but not limited to a consent solicitation, relating to the election of directors of the Corporation) whose appointment or election by the Board or nomination for election by the Corporation's stockholders was approved by the vote of at least two-thirds (2/3) of the directors then still in office or whose appointment, election or nomination was previously so approved or recommended; (iii) any dissolution or liquidation of the Corporation or International Truck and Engine Corporation or sale or disposition of all or substantially all (more than 50%) of the assets of the Corporation or of International Truck and Engine Corporation occurs; or (iv) as the result of, or in connection with, any cash tender offer, exchange offer, merger or other business combination, sale of assets, proxy or consent solicitation, contested election or substantial stock accumulation (a "Control Transaction"), the members of the Board of Directors of the Corporation immediately prior to the first public announcement relating

to such Control Transaction shall immediately thereafter, or with two (2) years, cease to constitute a majority of the Board of Directors of the Corporation. Notwithstanding the foregoing, the sale or disposition of any or all of the assets or stock of Navistar Financial Corporation shall not be deemed a Change in Control.

(6) "Code" or "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time.

(7) "Committee" means the Committee on Compensation and Governance of the Board of Directors.

(8) "Common Stock" means the common stock of the Corporation.

(9) "Corporation" means Navistar International Corporation.

(10) "Employee" means a person regularly employed by the Corporation or any subsidiary of the Corporation, including its officers.

(11) "Exercise Price" means the amount for which one share of Common Stock may be purchased upon exercise of a Stock Option, as specified in the applicable Award Agreement.

(12) "Fair Market Value" means the average of the high and the low prices of a share of Common Stock on the Grant Date as set forth in the New York Stock Exchange — Composite Transactions listing published in the Midwest Edition of *The Wall Street Journal* or equivalent financial publication.

(13) "Fiscal Year" means the fiscal year of the Corporation.

(14) "Freestanding SAR" means any SAR that is granted independently of any Stock Option.

(15) "Grant Date" means, as determined by the Board or authorized Committee, (i) the date as of which the Board or such Committee approves an Award, or (ii) such other date as may be specified by the Board or such Committee. The Grant Date of a Stock Option will, unless the Committee expressly determines otherwise, be the business day on which the Committee approves the grant of such Stock Option.

(16) "Incentive Stock Option" means a right, as evidenced by an Award Agreement to purchase a certain number of shares of Common Stock at Fair Market Value for a period of no longer than ten (10) years from the date of grant which options are designed to meet the requirements set out under Section 422 of the Code.

(17) "Non-Employee Director" means as of the Grant Date of an Award an individual who is a director of the Corporation and not an employee of the Corporation or any of its subsidiaries.

(18) "Nonqualified Stock Option" means a right, as evidenced by an Award Agreement to purchase a certain number of shares of Common Stock at Fair Market Value for a period of not more than ten (10) years which options are stated not to be Incentive Stock Options under the Code.

(19) "Participant" means an Employee selected by the Corporation for participation in the Plan and, with respect to Stock Options, Restricted Stock and Stock Units, a Non-Employee Director.

(20) "Performance-Based Exception" means the performance-based exception from the tax deductibility limitation imposed by Code Section 162(m) as set forth in Section 162(m)(4)(C).

(21) "Performance Measure" means the performance measurement provided by Section VI.

(22) "Performance Period" means the period during which performance goals must be met for purposes of the Performance Measure.

(23) "Plan" means the Navistar International Corporation 2004 Performance Incentive Plan as set forth herein and as it may be amended hereafter from time to time.

(24) "Qualified Retirement" means with respect to an Employee a termination from employment from the Corporation or any of its subsidiaries that occurs after the Employee attains age 55 and at the time of the termination the Employee has either: (i) 10 or more years of continuous service, or (ii) 10 or more years of service that would constitute credited service under the definition contained in the International Truck and Engine Corporation Retirement Plan for Salaried Employees ("RPSE"). Qualified Retirement for a Non-Employee Director means retirement under a retirement policy of the Board for Non-Employee Directors.

(25) "Restoration Stock Option" means a Nonqualified Stock Option granted pursuant to Section VII(7) and which is awarded upon the exercise of a Stock Option earlier awarded under the Plan or any other plan of the Corporation, including an earlier awarded Restoration Stock Option (an "Underlying Option").

(26) "Restricted Stock" means a right to acquire one or more shares of Common Stock, as evidenced by an Award Agreement, that is restricted as to sale or transfer and subject to forfeiture.

(27) "Stock Appreciation Right" or "SAR" means an Award, granted either alone or in connection with a related Stock Option, pursuant to the terms of Section X of the Plan.

(28) "Stock Option" means either an Incentive Stock Option or a Nonqualified Stock Option.

(29) "Stock Units" mean units for Restricted Stock granted pursuant to Section XI.

(30) "Tandem SAR" means an SAR granted with respect to a share pursuant to Section X hereof in connection with a related Stock Option, under which: (a) the exercise of the SAR with respect to the share shall cancel the right to purchase such share under the related Stock Option, and (b) the purchase of the share under the related Stock Option shall cancel the right to exercise the SAR with respect to such share.

## SECTION IV

## ELIGIBILITY

Management will, from time to time, select and recommend to the Committee Employees who are to become Participants in the Plan. Such Employees will be selected from those who, in the opinion of management, have substantial responsibility in a managerial or professional capacity. Non-Employee Directors shall also be Participants in the Plan for the purpose of Nonqualified Stock Option Awards, Restricted Stock and Stock Units.

## SECTION V

## ANNUAL INCENTIVE AWARDS

(1) As soon as practical following the end of the Fiscal Year, the Committee will certify performance achieved against the performance criteria established at the beginning of the Fiscal Year. The performance criteria shall be determined in the discretion of the Committee considering all factors relevant to the management of the Corporation, provided that an Award under this Section that is intended to qualify for the Performance-Based Exception shall satisfy the Performance Measures and the requirements of Section 162(m) of the Internal Revenue Code.

(2) The Committee, in its sole discretion, may reduce or eliminate any Award otherwise earned based on an assessment of individual performance, but in no event may any such reduction result in an increase of the Award. The Committee shall determine the amount of any such reduction by taking into account such factors as it deems relevant including, without limitation: (a) performance against other financial or strategic objectives; (b) its subjective assessment of the Participant's overall performance for the year; and (c) prevailing levels of total compensation among similar companies.

(3) Performance criteria for Annual Incentive Awards will not be increased or decreased within a Fiscal Year except for extraordinary circumstances approved by the Committee.

(4) Payment of an Annual Incentive Award will be made in cash to the Participant as soon as practicable after an Annual Incentive Award determination has been made by the Committee. A Participant who is not an Employee at the end of a Fiscal Year will not be entitled to an Award for that Fiscal Year unless the Committee determines otherwise.

3

(5) The Committee may permit the deferral of any Award and may permit payment on deferrals to be made subject to rules and procedures it may establish. These rules may include provisions crediting interest on deferred cash accounts.

(6) The Committee shall set the performance criteria for each year's Annual Incentive Awards no later than the first 90 days of the Fiscal Year.

(7) Its shall be presumed unless the Committee determines to the contrary, that all Awards to Employees under this Section are intended to qualify for Performance-Based Exception. If the Committee does not intend an Award to qualify for the Performance-Based Exception the Committee shall reflect its intent in its records in such manner as the Committee determines to be appropriate. For the purpose of complying with the Performance-Based Exception rules of Section 162(m) of the Internal Revenue Code, the maximum Award under this Section of the Plan to any one Employee during any one Fiscal Year shall not exceed $4,000,000.

## SECTION VI

### PERFORMANCE MEASUREMENT

(1) Unless and until the Corporation's stockholders approve a change in the general Performance Measures set forth in this Section VI, the attainment of which may determine the degree of payout and/or vesting with respect to Awards that are designed to qualify for the Performance-Based Exception, the Performance Measures to be used for purposes of such Awards may be measured at the Corporation level, at a subsidiary level, or at an operating unit level and shall be chosen from among: (a) income measures (including, but not limited to, gross profits, operation income, earnings before or after taxes, earnings per share, cost reductions); (b) return measures (including, but not limited to, return on assets, capital, investment, equity, or sales); (c) cash flow, cash flow return on investments, which equals net cash flows divided by owners equity; (d) gross revenues from operations; (e) total revenue; (f) cash value added; (g) economic value added; (h) share price (including, but not limited to, growth measures and total shareholder return); (i) sales growth; (j) market share; (k) the achievement of certain quantitatively and objectively determinable non-financial performance measures (including, but not limited to, growth strategies, strategic initiatives, product development, product quality, corporate development, and leadership development); and (l) any combination of, or a specified increase in, any of the foregoing.

(2) The Committee shall set the Performance Measures for each year's Annual Incentive Awards no later than the first 90 days of the Fiscal Year.

(3) The Committee shall have the discretion to adjust the determination of the degree of attainment of the preestablished goals; provided that the Awards that are designated to qualify for Performance-Based Exception may not be adjusted upward (although the Committee shall retain the discretion to adjust such Awards downward).

(4) In the case of any Award that is granted subject to the condition that a specific Performance Measure be achieved, no payment under such Award shall be made prior to the time the Committee certifies in writing that that the Performance Measure has been achieved. For this purpose, approved minutes of the Committee meeting at which the certification is made shall be treated as a written certification. No such certification is required, however, in the case of an Award that is based solely on an increase in the value of a share of Common Stock from the date the Award is made.

## SECTION VII

### STOCK OPTIONS FOR EMPLOYEES

(1) The Committee may grant Nonqualified Stock Options or Incentive Stock Options or a combination of both to Employee Participants in the amount and at the time that the Committee approves. In order to provide a limitation on the number of shares as provided for in Section 162(m) of the Internal Revenue Code and the regulations thereunder, Stock Option grants shall be limited to a maximum of 1,000,000 shares per year for any Participant.

(2) The Committee will document the terms of the Stock Option in an Award Agreement to include the Grant Date and Exercise Price, as well as any other terms that it may desire. The Exercise Price under a Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the Grant Date. Subject to adjustment pursuant to Section XII, the Exercise Price of outstanding Options fixed by the Committee shall not be modified.

(3) Unless otherwise determined by the Committee, a Stock Option granted under the Plan will become exercisable in whole or in part after the commencement of the second year of the term of the Stock Option to the extent of one third of the shares, to the extent of one third of the shares after commencement of the third year, and to the extent of one third of the shares after commencement of the fourth year.

(4) A Stock Option granted under the Plan will be exercisable during such period as the Committee may determine, and will be subject to earlier termination as hereinafter provided. In no event, however, may a Stock Option governed by the Plan be exercised after the expiration of its term. Except as provided herein, no Stock Option may be exercised at any time unless the Participant who holds the Stock Option is then an Employee. The option can be exercised in whole or in part through cashless exercises or other arrangements through agents, including stockbrokers, under arrangements established by the Corporation by paying the amounts required by instructions issued by the Secretary of the Corporation for the exercise of the Stock Options. If an exercise is not covered by instructions issued by the Corporate Secretary, the purchase price is to be paid in full to the Corporation upon the exercise of a Stock Option either (i) by cash including a personal check made payable to the Corporation, (ii) by delivering at Fair Market Value unrestricted Common Stock already owned by the Participant, for six months or more if acquired from the Corporation, or (iii) by any combination of cash and unrestricted Common Stock, and in either case, by payment to the Corporation of any withholding tax. In no event may successive simultaneous pyramiding be used to exercise a Stock Option. Shares which otherwise would be delivered to the holder of a Stock Option may be delivered, at the election of the holder, to the Corporation in payment of federal, state and/or local withholding taxes payable in connection with an exercise.

(5) The Participant who holds a Stock Option will have none of the rights of a shareowner with respect to the shares subject to a Stock Option until such shares are issued upon the exercise of a Stock Option.

(6) Neither the Corporation nor any subsidiary may directly or indirectly lend money to any Participant for the purpose of assisting the individual to acquire shares of Common Stock issued upon the exercise of Stock Options granted under the Plan.

(7) Provisions for Restoration Stock Options may be contained in the terms of options granted under the Plan. Restoration Stock Options may be granted under the Plan pursuant to the following terms: (a) Restoration Stock Options may be granted if the Participant elects to make a restoration option exercise of an Underlying Option, pays the exercise price by transferring to the Corporation Common Stock of the Corporation held by the Participant, for six months or more if acquired from the Corporation, and pays the withholding tax by transferring Common Stock or cash. The number of Restoration Stock Options that will be granted is equal to the number of shares used to pay the exercise price and the number of shares with value equal to the tax liability; (b) The Restoration Stock Options will have a term equal to the remaining term of the Underlying Option, will have an Exercise Price equal to the Fair Market Value of the stock on the date of grant of the Restoration Option, and will become exercisable in six months after grant (or, if sooner, one month before the end of the term of the Underlying Option), and otherwise will have the same general terms and conditions Nonqualified Stock Options granted by the Corporation; (c) The shares that represent the difference between the Exercise Price of the Underlying Option and the value of the shares on the date of exercise, less withholding taxes, generally cannot be transferred for a period of three (3) years; and (d) At the election of the Participant delivery of the shares may be deferred.

(8) In the event of the termination of the employment of a Participant who holds an outstanding Stock Option, other than by reason of death, total and permanent disability or a Qualified Retirement, the Participant may (unless the Stock Option shall have been previously terminated) exercise the Stock Option at any time within three (3) months after such termination, but not after the expiration of the term of the grant, to the extent of the number of shares which were exercisable at the date of the termination of employment. Stock Options governed by the Plan will not be affected by any change of employment so long as the Participant continues to be an Employee. Provided, however, if the Participant is terminated for cause as defined in the International Truck and Engine Corporation Income Protection Plan, or if the Participant is covered by a different severance plan or agreement, then as defined in such plan or agreement, the three-month period provided by this subsection shall not apply and the Stock Option shall cease to be exercisable and shall lapse as of the effective date of the termination of the Employee.

(9) Except as provided in Section VII(12), in the event of a Qualified Retirement a Participant who holds an outstanding Stock Option may exercise the Stock Option to the extent the option is exercisable or becomes exercisable under its terms, at any time during the term of the option grant.

(10) In the event of a total and permanent disability, as defined by the Corporation's long term disability programs, a Participant who holds an outstanding Stock Option may exercise the Stock Option, to the extent the Stock Option is exercisable or becomes exercisable under its terms, at any time within three (3) years after such termination or, if later, the date on which the option becomes exercisable with respect to such shares, but not after the expiration of the term of the option grant.

(11) In the event of the death of a Participant who holds an outstanding Stock Option, the Stock Option may be exercised by a legatee, or by the personal representatives or distributees, at any time within a period of two (2) years after death, but not after the expiration of the term of the grant. If death occurs while employed by the Corporation or a subsidiary, or after a Qualified Retirement, or during the three- year period specified in Section VII(10), Stock Options may be exercised to the extent of the remaining shares covered by Stock Options whether or not such shares were exercisable at the date of death. If death occurs during the three-month period specified in Section VII(8), Stock Options may be exercised to the extent of the number of shares that were exercisable at the date of death.

(12) Notwithstanding the other provisions of Sections VII(9) or VII(11), no Stock Option which is not exercisable at the time of a Qualified Retirement shall become exercisable after such Qualified Retirement if, without the written consent of the Corporation, a Participant engages in a business, whether as owner, partner, officer, employee, or otherwise, which is in competition with the Corporation or one of its affiliates, and if the Participant's participation in such business is deemed by the Corporation to be detrimental to the best interests of the Corporation. The determination as to whether such business is in competition with the Corporation or any of its affiliates, and whether such participation by such person is detrimental to the best interests of the Corporation, shall be made by the Corporation in its absolute discretion, and the decision of the Corporation with respect thereto, including its determination as to when the participation in such competitive business commenced, shall be conclusive.

## SECTION VIII

## STOCK OPTIONS NON-EMPLOYEE DIRECTORS

(1) The Committee may grant Nonqualified Stock Options to Non-Employee Directors.

(2) The Committee will document the terms of the Stock Option to include the Grant Date and Exercise Price, as well as any other terms that it may desire. The Exercise Price under a Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a share of Common Stock on the Grant Date. Subject to adjustment pursuant to Section XII, the Exercise Price of outstanding Stock Options fixed by the Committee shall not be modified.

(3) Unless otherwise determined by the Committee, a Stock Option granted under this Section of the Plan will become exercisable in whole or in part after the commencement of the second year of the term of the Stock Option to the extent of one third of the shares, to the extent of one third of the shares after commencement of the third year, and to the extent of one third of the shares after commencement of the fourth year.

(4) A Stock Option granted this Section of the Plan will be exercisable during such period as the Committee may determine, and will be subject to earlier termination as hereinafter provided. In no event, however, may a Stock Option governed by the Plan be exercised after the expiration of its term.

(5) Except as provided herein, no Stock Option granted under this Section of the Plan may be exercised at any time unless the Participant who holds the Stock Option is then a Non-Employee Director.

(6) A Stock Option granted under this Section of the Plan can be exercised in whole or in part through cashless exercises or other arrangements through agents, including stockbrokers, under arrangements established by the Corporation by paying the amounts required by instructions issued by the Secretary of the Corporation for the exercise of the options. If an exercise is not covered by instructions issued by the Corporate Secretary, the purchase price is to be paid in full to the Corporation upon the exercise of a Stock Option either (i) by cash including a personal check made payable to the Corporation; (ii) by delivering at Fair Market Value unrestricted Common Stock already owned by the Participant, for six months or more if acquired from the Corporation, or (iii) by any combination of cash and unrestricted Common Stock, and in either case, by payment to the Corporation of any withholding tax. In no event may successive simultaneous pyramiding be used to exercise a Stock Option. Shares which otherwise would be delivered to the holder of a Stock Option may be delivered, at the election of the holder, to the Corporation in payment of federal, state and/or local withholding taxes payable in connection with an exercise.

(7) The Non-Employee Director who holds a Stock Option will have none of the rights of a shareowner with respect to the shares subject to a Stock Option until such shares are issued upon the exercise of a Stock Option.

(8) Neither the Corporation nor any subsidiary may directly or indirectly lend money to any Non-Employee Director for the

purpose of assisting the individual to acquire shares of Common Stock issued upon the exercise of Stock Options granted under the Plan.

(9) In the event of the termination of service as a Non-Employee Director, other than by reason of death, total and permanent disability or a Qualified Retirement, a Non-Employee Director who holds an outstanding Stock Option may (unless the Stock Option shall have been previously terminated) exercise the Stock Option at any time within three (3) months after such termination, but not after the expiration of the term of the grant, to the extent of the number of shares which were exercisable at the date of the termination of service.

(10) Except as provided in Section VII(13), in the event of Qualified Retirement a Non-Employee Director who holds an outstanding Stock Option may exercise the Stock Option to the extent the Stock Option is exercisable or becomes exercisable under its terms, at any time during the term of the option grant.

(11) In the event of a total and permanent disability, as determined by the Committee, a Non-Employee Director who holds an outstanding Stock Option may exercise the Stock Option, to the extent the option is exercisable or becomes exercisable under its terms, at any time within three (3) years after such termination or, if later, the date on which the Stock Option becomes exercisable with respect to such shares, but not after the expiration of the term of the option grant.

(12) In the event of the death of a Non-Employee Director who holds an outstanding Stock Option, the Stock Option may be exercised by a legatee, or by the personal representatives or distributees, at any time within a period of two (2) years after death, but not after the expiration of the term of the grant. If death occurs while the Participant is serving as a Non-Employee Director, or after a Qualified Retirement, or during the three-year period specified in Section VIII(11), Stock Options may be exercised to the extent of the remaining shares covered by the Stock Options whether or not such shares were exercisable at the date of death. If death occurs during the three-month period specified in Section VIII(9), Stock Options may be exercised to the extent of the number of shares that were exercisable at the date of death.

(13) Notwithstanding the other provisions of Sections VIII(10) or VIII(12), no option which is not exercisable at the time of a Qualified Retirement shall become exercisable after such Qualified Retirement if, without the written consent of the Corporation, a Non-Employee Director engages in a business, whether as owner, partner, officer, employee, or otherwise, or serves as a director for such business, which is in competition with the Corporation or one of its affiliates, and if the Non-Employee Director's participation in such business is deemed by the Corporation to be detrimental to the best interests of the Corporation. The determination as to whether such business is in competition with the Corporation or any of its affiliates, and whether such participation by such person is detrimental to the best interests of the Corporation, shall be made by the Corporation in its absolute discretion, and the decision of the Corporation with respect thereto, including its determination as to when the participation in such competitive business commenced, shall be conclusive.

## SECTION IX

### PROHIBITION ON REPRICING AND DISCOUNTED OPTIONS

Notwithstanding any other provision in the Plan, no Stock Option issued under the Plan may be amended or modified in any way that changes the Exercise Price of the Stock Option, and no Stock Option may be issued with an Exercise Price that is less than the Fair Market Value of one share of Common Stock on the Grant Date of the Stock Option or in any other way discounted. This provision shall not limit any adjustments provided by Section XII relating to adjustments upon changes in capitalization.

## SECTION X

### STOCK APPRECIATION RIGHTS AND OTHER AWARDS

(1) Subject to the terms of the Plan, the Committee may grant any types of Awards other than Stock Options provided for in Sections VII and VIII, and Restricted Stock provided for in Section XI, including but not limited to SARs. The Committee shall determine the terms and conditions of such Awards.

(2) The Committee may, subject to the terms of the Plan, grant SARs to Employee Participants at any time and from time to time as shall be determined by the Committee. The Committee may grant Freestanding SARs, Tandem SARs, or any combination thereof. The Committee shall have complete discretion in determining the number of SARs, subject to the terms of the Plan, and to determine

the terms of the SARs. The grant price of a Freestanding SAR shall equal the Fair Market Value of one share of Common Stock on the Grant Date. The Exercise Price of Tandem SARs shall equal the Exercise Price of the related Stock Option.

(3) Tandem SARs may be exercised for all or part of the shares subject to the related Stock Option upon the surrender of the right to exercise the equivalent portion of the related Stock Option. A related Stock Option is then exercisable.

(4) Notwithstanding any other provision of the Plan to the contrary, with respect to a Tandem SAR granted in connection with an Incentive Stock Option: (a) The Tandem SAR shall expire no later than the expiration than the expiration of the Incentive Stock Option; (b) The value of the payout with respect to the Tandem SAR shall not exceed the excess of the fair market value of the shares subject to Incentive Stock Option at the time the Tandem SAR is exercised over the Exercise Price under the Incentive Stock Option; and (c) The Tandem SAR may be exercised only when the Fair Market Value of the shares subject to the Incentive Stock Option exceed the Exercise Price of the Incentive Stock Option.

(5) Freestanding SARs may be exercised upon whatever terms and conditions the Committee, in its discretion, impose upon them, subject, however, to the terms of the Plan.

(6) The term of SARs shall be determined by the Committee, in its discretion; provided that such term shall not exceed 10 years.

(7) Upon exercise of a SAR, a Participant shall be entitled to receive payment from the Corporation in an amount determined by multiplying: (a) the excess of fair market value of one share of Common Stock on the date of exercise over the Exercise Price, by (b) the number of shares with respect to which the SAR is exercised. At the discretion of the Committee, the payment upon exercise of a SAR may be in cash, in share equivalent fair market value, or in a combination thereof.

(8) Its shall be presumed unless the Company determines to the contrary, that all awards to Employees under this Section are intended to qualify for Performance-Based Exception. If the Committee does not intend an Award to an Employee to qualify for the Performance-Based Exception the Committee shall reflect its intent in its records in such manner as the Committee determines to be appropriate. For the purpose of complying with the Performance-Based Exception rule of Section 162(m) of the Internal Revenue Code, the number of SARs that can be granted to any one Employee in any Fiscal Year shall not exceed 1,000,000 shares, less the number of stock options grant to such Employee during the year. Any Award the value of which is not solely dependent on value of the stock on which the award is based shall not exceed $4,000,000 for any Employee for the year.

## SECTION XI

### RESTRICTED STOCK

(1) Restricted Stock, or Stock Units, may be granted during a Fiscal Year or at any time thereafter. Awards under the Plan may be granted in the form of Restricted Stock, in the form of Stock Units, or in any combination of both. Restricted Stock or Stock Units may also be awarded in combination with Stock Options, and such an Award may provide that the Restricted Shares or Stock Units will be forfeited in the event that the terms of the Award Agreement are not fulfilled.

(2) Awards of Restricted Stock or Stock Units may be made under the Plan to Participants for meeting the stock ownership requirements as described in the Navistar Executive Stock Ownership Program, as may be amended from time to time by the Board of Directors, in their sole discretion, or for any other purpose.

(3) Each Award of Restricted Stock or Stock Units shall become vested, in full or in installments, upon satisfaction of the conditions specified in the Award Agreement. In no event will an Award of Restricted Stock or Stock Units granted under the Plan vest in full prior to the commencement of the third year anniversary of the Grant Date.

(4) The Participant will be entitled to all dividends paid with respect to all Restricted Stock awarded under the Plan during the period of restriction and will not be required to return any such dividends to the Corporation in the event of the forfeiture of the Restricted Stock. The Participant also will be entitled to vote Restricted Stock during the period of restriction.

(5) All Restricted Stock certificates awarded under the Plan are to be delivered to the Participant with an appropriate legend imprinted on the certificate.

(6) In the event a Participant dies while employed by or as serving as a Non-Employee-Director of the Corporation or following a

8

Qualified Retirement or total or permanent disability, the Restricted Stock or Stock Units will vest as of the date of death and all restrictions shall lapse and the Restricted Stock or Stock Units will be immediately transferable to the named beneficiary or to the Participant's estate. Any Restricted Stock or Stock Units that becomes payable after the Participant's death shall be distributed to the Participant's beneficiary or beneficiaries. A beneficiary designation may be changed by filing the prescribed form with the Secretary of the Corporation at any time before the Participant's death. If no beneficiary was designated or if no designated beneficiary survives the Participant, then any Restricted Stock or Stock Units that becomes payable after the Participant's death shall be distributed to the Participant's estate.

(7) In the event a Participant who holds unvested Restricted Stock or Stock Units, terminates employment or service as a Non-Employee Director with the Corporation by reason of Qualified Retirement or total and permanent disability, the Restricted Stock or Stock Units will continue to vest according to the terms of the Restricted Stock.

(8) In the event a Participant otherwise terminates employment or service as a Non-Employee Director, any Restricted Stock or Stock Units that is not vested forfeits to the Corporation.

(9) Its shall be presumed unless the Committee determines to the contrary, that all awards to Employees under this Section of the Plan are intended to qualify for Performance-Based Exception. If the Committee does not intend an Award to an Employee to qualify for the Performance-Based Exception the Committee shall reflect its intent in its records in such manner as the Committee determines to be appropriate. For the purpose of complying with the Performance-Based Exception rules of Section 162(m) of the Internal Revenue Code, the maximum Award under this Section of the Plan to any one Employee during any one Fiscal Year shall not exceed 1,000,000 shares.

## SECTION XII

## ADJUSTMENTS UPON CHANGES IN CAPITALIZATION

Notwithstanding any other provision of the Plan, the Award Agreements may contain such provisions as the Committee determines to be appropriate for the adjustment of the number and class of shares, subject to each outstanding Stock Option or SAR, the exercise prices in the event of changes in, or distributions with respect to, the outstanding Common Stock by reason of stock dividends, recapitalizations, mergers, consolidations, split-ups, combinations or exchanges of shares, spinoffs and the like, in the event of any such changes in, or distribution with respect to, the outstanding Common Stock, the aggregate number and class of shares available under the Plan and the limits applicable to Awards under the Plan, in each case, shall be appropriately adjusted by the Committee, whose determination shall be conclusive.

## SECTION XIII

## ADMINISTRATION OF THE PLAN

Full power and authority to construe, interpret and administer the Plan is vested in the Committee. Decisions of the Committee will be final, conclusive and binding upon all parties, including the Corporation, shareowners, Non-Employee Directors and Employees. The foregoing will include, but will not be limited to, all determinations by the Committee as to (a) the approval of Employees and Non-Employee Directors for participation in the Plan, (b) the amount of the Awards, (c) the performance levels at which different percentages of the Awards would be earned and all subsequent adjustments to such levels and (d) the determination of all Awards. Any person who accepts any Award hereunder agrees to accept as final, conclusive and binding all determinations of the Committee. The Committee will have the right, in the case of Employees not employed in the United States, or Non-Employee Directors not resident in the United States, to vary from the provision of the Plan to the extent the Committee deems appropriate in order to preserve the incentive features of the Plan.

## SECTION XIV

## NON-ASSIGNMENT

Awards under the Plan may not be assigned or alienated. In case of a Participant's death, the amounts distributable to the deceased Participant under the Plan with respect to which a designation of beneficiary has been made (to the extent it is valid and enforceable under applicable law) shall be distributed in accordance with the Plan to the designated beneficiary or beneficiaries. The amount distributable to a Participant upon death and not subject to such a designation shall be distributed to the Participant's estate. If there is

any question as to the right of any beneficiary to receive a distribution under the Plan, the amount in question may be paid to the estate of the Participant, in which event the Corporation will have no further liability to anyone with respect to such amount.

## SECTION XV

## WITHHOLDING TAXES

A Participant may elect, subject to the provisions of the applicable Sections of the Plan and the terms of the Award, to pay any withholding tax due in connection with the exercise of any Stock Option or SAR or upon the vesting of Restricted Stock or the settlement of any other Award either (i) by cash including a personal check made payable to the Corporation or (ii) by delivering at Fair Market Value unrestricted Common Stock already owned by the Participant and if acquired from the Corporation owned for at least six months, or (iii) by any combination of cash or unrestricted Common Stock. The Committee may provide, in the Award Agreement, that in the event that a Participant is required to pay to the Corporation any amount to be withheld in connection with the exercise, vesting or settlement of an Award denominated in shares, the Participant may satisfy such obligation (in whole or in part) by electing to have the Corporation withhold a portion of the shares of Common Stock otherwise to be issued upon exercise, vesting or settlement of such Award equal in value to the minimum amount required to be withheld. The value of the shares to be withheld shall be the Fair Market Value on the date that the amount of tax to be withheld is determined.

## SECTION XVI

## RIGHTS OF PARTICIPANT

To the extent that any Participant, beneficiary or estate acquires a right to receive payments or distributions under the Plan, such right will be no greater than the right of a general unsecured creditor of the Corporation. All payments and distributions to be made hereunder will be paid from the general assets of the Corporation. Nothing contained in the Plan, and no action taken pursuant to its provisions, shall create or be construed to create any contracted right or trust of any kind or fiduciary relationship between the Corporation and any Participant, beneficiary or estate.

## SECTION XVII

## MODIFICATION, AMENDMENT OR TERMINATION

The Committee may modify, amend, or terminate the Plan at any time, provided that, unless the requisite approval of stockholders is obtained, no amendment shall be made to the Plan if such amendment would (i) increase the number of shares of Common Stock available for issuance under the Plan or increase the limits applicable to Awards under the Plan, in each case, except as provided in Section XII; (ii) lower the Exercise Price of the Stock Option or SAR grant value below 100% of the Fair Market Value of one share of Common Stock on the Grant Date, except as provided in Section XII; (iii) remove the repricing restriction set forth in Section IX; or (iv) require stockholder approval as a matter of law or under rules of the New York Stock Exchange. No Plan amendment shall, without the affected Participant's consent, terminate or adversely affect any right or obligation under any Stock Option or other Award previously granted under the Plan.

## SECTION XVIII

## RESERVATION OF SHARES

(1) The total number of shares of Common Stock reserved and available for delivery pursuant to this Plan is 3,250,000 shares of Common Stock. The number of shares authorized and available shall be increased by shares of Common Stock subject to an option or award under this Plan or any other plan, including the Navistar 1994 Performance Incentive Plan, the Navistar 1998 Supplemental Stock Plan, or the 1998 Non-Employee Director Stock Option Plan, that is cancelled, expired, forfeited, settled in cash or otherwise terminated without a delivery of shares to the Participant of the plan, including shares used to pay the option exercise price of an option issued under the Plan or any other plan or to pay taxes with respect to such an option.

(2) In order to provide a limitation on the number of shares that may be issued as Incentive Stock Options as provided by the Code, no more than 1,000,000 shares of Common Stock, or if less the number of shares that may be issued under the Plan, shall be granted as Incentive Stock Options in any calendar year. Such shares may be in whole or in part, as the Board of Directors shall from time to time determine, authorized and unissued shares of Common Stock or issued shares of Common Stock which shall have been

reacquired by the Corporation.

(3) In order to provide a limitation on the number of shares that may be issued as Restricted Stock, Stock Units, SARs, and Awards other than Stock Options, no more than 1,000,000 shares of Common Stock that may be issued under the Plan shall be granted as Restricted Stock, Stock Units, SARs, or Awards other than Stock Options.

## SECTION XIX

### RIGHTS OF EMPLOYEES

Status as an Employee shall not be construed as a commitment that any one or more Awards will be made under this Plan to an Employee or to Employees generally. Status as a Participant shall not entitle the Participant to any additional future Awards. Nothing in the Plan will confer on any Employee or Participant any right to continue in the employ of the Corporation or any of its subsidiaries or interfere with or prevent in any way the right of the Corporation or any of its subsidiaries to terminate an Employee or Participant's employment at any time for any reason.

## SECTION XX

### CHANGE IN CONTROL

Notwithstanding any provision contained herein to the contrary, in the event of a Change in Control, all awarded Restricted Stock and Stock Units will immediately be free of all restrictions and performance contingencies and will be deemed fully earned and not subject to forfeiture and all outstanding Stock Options governed by the Plan will be immediately exercisable and shall continue to be exercisable for a period of three (3) years from the date of the Change in Control regardless of the original term or employment status, except that the term of any Incentive Stock Option shall not be extended beyond ten (10) years from the date of grant.

## SECTION XXI

### LIMITATION OF ACTIONS

Every right of action by or on behalf of the Corporation or any shareowner against any past, present or future member of the Board of Directors, officer or Employee arising out of or in connection with the Plan will, irrespective of the place where action may be brought and irrespective of the place of residence of any such director, officer or employee, cease and be barred by the expiration of three (3) years from whichever is the later of (a) the date of the act or omission in respect of which such right of action arises or (b) the first date upon which there has been made generally available to shareowners an annual report of the Corporation and a proxy statement for the annual meeting of shareowners following the issuance of such annual report, which annual report and proxy statement alone or together set forth, for the related period, the aggregate amount of Awards under the Plan during such period; and any and all right of action by an Employee or Non-Employee Director (past, present or future) against the Corporation arising out of or in connection with the Plan shall, irrespective of the place where action may be brought, cease and be barred by the expiration of three (3) years from the date of the act or omission in respect of which such right of action arises.

## SECTION XXII

### GOVERNING LAW

The Plan will be governed by and interpreted pursuant to the laws of the State of Delaware, the place of incorporation of the Corporation, without giving effect to the principals of conflict of laws.

## SECTION XXIII

### EFFECTIVE DATE

The effective date of the Plan shall be February 17, 2004 (the "Effective Date"), subject to approval by the stockholders at the Corporation's Annual Meeting to be held on February 17, 2004, or any adjournment thereof. The Plan shall continue in effect for ten (10) years from the Effective Date, expiring February 16, 2014. No Awards may be granted under the Plan subsequent to February 16, 2014, but Awards theretofore granted may extend beyond that date in accordance with their terms.

# TAXATION OF NAVISTAR STOCK OPTIONS
## (February 2004)

### *Summary*

The Company grants two types of stock options to employees, non-qualified stock options ("NQO") and incentive stock options ("ISO"). ISOs may be eligible for more favorable tax treatment because more of the income is potentially eligible for long-term capital gain treatment. Only non-qualified options are granted to Non-Employee Directors, and these are generally tax the same as non-qualified options granted to employees, except that directors are independent contractors and therefore not subject to FICA or general income tax withholding by the Company.

Stock options granted under the Restoration Program are non-qualified stock options. However, the Company's restoration stock option program can provide for the deferral of the delivery of the shares in a restoration type exercise. In this case the income is recognized for tax purposes at the time the shares are delivered, and the amount of the income is determined bases on the value of the stock on the date of delivery.

When ordinary income is realized on a stock option, the income is taxable at the employee's marginal tax rate. The highest federal tax rate is currently 35%, after the reductions made by the recent tax legislation. Hospital insurance tax at 1.45% also applies, since there is no wage base limitation as there is for the Social Security tax of 6.2%. Long-term capital gains, on the other hand, are generally taxable at a maximum federal rate that has been reduced from 20% to 15%. Capital gains are now considered long term if the stock was held for more than one year. The rate reductions apply for a limited number of years under the current law, however it is assumed in this memorandum the reduced rates will continue indefinitely.

Several years ago the IRS took the position that ISOs would not be subject to FICA tax or income tax withholding pending review by the IRS. The IRS has maintained the position that ISOs are not subject to FICA or withholding and indicated it would not impose FICA on ISO before the second taxable year after final regulations were adopted. It is generally assumed that the IRS will request that Congress adopt legislation to deal with FICA and withholding on ISOs. At this time there is no FICA or required withholding on ISO and likely will not be at least through 2004.

**NQOs.** When an employee exercises a NQO, the spread (the difference between the exercise price and the value of the stock on the date of exercise) is taxable as ordinary income. If the employee holds the stock for <u>more than</u> one year, any gain realized on the subsequent sale of the stock will be eligible for the 20% long-term capital gain rate. (If an officer could not sell the stock because of the insider trading rules under Section 16b, he would not recognize income during the Section 16b period, unless he filed an election to recognize income under §83(b) of the Code.)

**ISOs.** If an employee exercises an ISO and continues to hold the stock, no income is recognized at the time of the exercise. When the employee subsequently sells the stock, he will generally be eligible for the 15% long-term capital gain rate on all of the gain, both the spread that existed at the time of exercise and any increase in value after the exercise. To get the 15% rate, the

employee must hold the stock for two years from the date of the grant or the option, he most hold the stock for more than one year from the date of exercise of the option, and the employee most exercise the option within three (3) months of retirement or other termination of employment from the Company (one year in the case of disability). The employee needs to consider the alternative minimum tax implications of holding ISO stock. The spread (the excess of the value of the stock over the option price) at the time of exercise is a tax preference, and some employees could incur a minimum tax liability, which may require the payment of tax to the IRS. Generally when the employee sells the stock there is a negative adjustment to income for ATM purposes and this usually will entitle the employee to get the AMT back for the year in which he sells the stock.

**Exchange of shares.** If an employee uses Company stock that he owns to pay the exercise price of a stock option, generally he will not recognize gain on his use of the old stock. He will be treated as having exchanged old shares of Company stock for an equal number of new shares of Company stock. He does not recognize gain on the exchange and his basis and holding period will carryover to the new stock. (There are limitations on using ISO stock for this purpose.)

**The details.** Stock options are often subject to tax planing opportunities because the employee has some control over the timing and method of exercise and the holding of disposition of the stock. The tax rules are often complex. Some of the rules are summarized in this memorandum. Employees are advised to consult their tax and financial advisors to review the considerations involved in holding or exercising stock options.

## CAPITAL GAINS TAXATION

The Jobs and Growth Tax Relief Reconciliation Act of 2003 (the "Act") reduced the potential tax rate that applies to long-term capital gain. Generally the maximum federal rate was reduced from 20% to 15%. The Act also accelerated ordinary income tax rate reductions that had previously been adopted during the Bush Administration. The maximum federal rate is generally 35% and each person must consider what his marginal rate is based on his income for income tax purposes. The differential in tax rates could affect the relative value of ISOs compared to NQOs. It may also affect the relative advantage of using restoration options since the future gain on the shares acquired through a restoration option exercise is potentially eligible for capital gain treatment. Generally, stock acquire by exercise of an ISO or otherwise must be held for <u>more than one year</u> to be taxed at the lower long-term capital gains rates.

As discussed in the ISO section of this memorandum, there is a one-year and a two-year holding period that must be met for favorable tax treatment of an ISO. These holding periods are in addition to the capital gains holding period rules.

## NON-QUALIFIED STOCK OPTIONS

Options granted under the Company's 2004 Performance Incentive Plan will state whether the options are intended to be NQOs or ISOs. All options that will be granted as restoration options will be NQOs.

Income is recognized at the time of exercise of the option. (If a Section 16(b) holding period applied under the Securities laws, the income would be recognized at the end of the 16(b) period, unless the employee elected to recognize the income at the time of exercise by filing a section 83(b) election). The amount of the income is the difference between the option price paid to the Company to exercise the option and the market value of the stock. This difference between the price and value is often referred to as the spread. The income is taxable as ordinary income. The employee's basis in the stock received is equal to the sum of the amount paid for the shares and the amount of income recognized. Gain or loss on the subsequent sale of the stock is capital gain or loss. The rate that applies to the capital gain depends on the length of the period for which the stock was held from the date of exercise. Generally, the stock must be held for more than one year to qualify for the 15% long-term capital gains rate. If previously owned stock is used to pay the exercise price (as it would be if a restoration option exercise is made), gain or loss on the old stock is not recognized, and the basis of the new stock is adjusted for the non-recognized gain or loss.

The income realized on a NQO is subject to FICA taxes.

**Example 1, NQO cash exercise.** The employee exercises an option to purchase 150 shares at $25 per share. He pays the option price in cash using a cashless exercise program the company established with a stockbroker. Under the cashless exercise program the employee does not have to advance any part of the option price. The value of the stock at the time of exercise is $30. The employee recognizes income of $750, which is taxed as ordinary income at the employee's marginal rate. The employee's basis in the stock would be $4,500, the price paid at $25 per share times 150 shares plus the income recognized of $750. If the stock were sold in two years at $40 per share, there would be a capital gain of $10 per share, or $1,500. The capital gain would be long-term because the stock was held for more than one year. Any net long-term gain would be taxed at a maximum rate of 15%.

**Example 2, NQO exercised with previously owned stock held at a gain.** In April 2004 the value of the stock is $50 per share. The employee exercises an option granted in 2003 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) previously acquired in the market for $25 per share. The employee will be treated as having exchanged 80 old shares for 80 new shares. This exchange is non-recognized for tax purposes. The transaction is not recognized because a special rule of the Internal Revenue Code provides that an exchange of common stock for common stock in the same corporation is not recognized (§1036). Gain or loss is not recognized and the taxpayer's basis carries over. As a result, the employee's basis in his old shares carries over to become his basis in the new shares, so he has 80 new shares with a basis of $25 per share ($2,000). The employee's basis in the other 20 shares is $1,000, or $50 per share. This is the amount of income recognized on the exercise of the 100 options ($50 less $40 times 100 shares). On the subsequent sale of the 80 shares or the 20 shares, the employee will recognize gain to the extent the sale price exceeds the basis. For the purpose of the holding period required for long-term capital gain treatment, the 80 exchanged shares will be considered to be acquired on the date the old 80 shares were acquired, and the new 20 shares will be considered to be acquired on the date the shares are transferred to the

3

employee.

**Example 3, NQO exercised with previously acquired NQO stock held at a gain.** The facts are the same as in Example 2 except that the employee uses stock acquired by exercise of a NQO to pay the option price. The results are the same as in Example 2 in that the gain on the old shares is non-recognized.

**Example 4, NQO exercised with previously acquired ISO post-holding period stock held at a gain.** The facts are the same as in Example 2, except that the employee uses stock acquired by exercise of an ISO and the employee held the stock for the ISO holding periods (two years from grant, one year from transfer on exercise, as described in Example 12). The result is the same as in Example 2 in that the gain on the old stock is not recognized. However, in this Example 4 the non-recognized gain is likely to be larger because the gain includes the non-recognized gain that was realized on exercise of the ISO (see Examples 9 and 17) regarding exercise of an ISO).

**Example 5, NQO exercised with previously acquired ISO pre-holding period stock held at a gain.** The facts are the same as in Example 2, except that the employee uses stock acquired by exercise of an ISO, and the employee had not held that stock for the ISO holding periods (two years from grant, one year from transfer on exercise, as described in Example 12). The result is the same as in Example 2 in that gain on the 80 old shares will not be recognized. However, there are two differences. The non-recognized gain is likely to be larger because the gain includes the non-recognized gain that was realized on exercise of the ISO (see Examples 9 and 17 regarding exercise of an ISO). Secondly, there are special disqualifying disposition rules that apply when ISO stock is disposed of before the two-year and one-year holding periods are satisfied. These requirements will carry over to the new 80 shares of stock. These rules are described in Example 12. To illustrate, if the employee sold the new 80 shares within two years from the grant of the ISO, or within one year from the transfer of the ISO stock on exercise of the ISO, the gain recognized would be taxable as ordinary income to the extent that the market value of the ISO stock on the date of the grant of the ISO exceeded the ISO option price.

**Example 6, NQO exercised with previously owned stock held at a loss.** In April 2004 the value of the stock is $50 per share. The employee exercises an option granted in 2003 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) previously acquired in the market for $75 per share. The employee will be treated as having exchanged 80 old shares for 80 new shares. This exchange is non-recognized as an exchange of common stock for common stock in the same corporation. The employee's basis in his old shares carries over to become his basis in the new shares, so he has 80 new shares with a basis of $75 per share ($6,000). The employee's basis in the other 20 shares is $1,000 or $50 per share. This is the amount of income recognized on the exercise of the 100 options ($50 - $40 times 100 shares). For the purpose of the more than one year holding period required for lower capital gains rates, the 80 exchanged shares will be considered to be acquired on the date the 80 old shares were acquired, and the 20 new shares will be considered to be acquired on the date the shares are transferred to the employee.

4

**Example 7, NQO, cash exercise with proceeds from sale of old shares sold at a loss, wash sale.** The facts are the same as in Example 6 except instead of transferring the old shares to the company to pay the exercise price, the employee sells 80 old shares on the stock market for $50 per shares, and on the settlement date pays the proceeds to the company to pay the option price. Under the wash sale rules, the employee is not allowed to recognize the capital loss on the shares because he purchased identical shares within 30 days of the sale. His basis in the old shares will carry over and become his basis in the 80 new shares. If he sold the old shares more than 30 days before, or more than 30 days after, the exercise of the option, he would be allowed a capital loss on the sale. In general, a capital loss can be used to offset capital gain, and a net loss can be deducted, subject to a $3,000 per year limitation. A capital loss not used in a year can be carried over and used in subsequent years.

## INCENTIVE STOCK OPTIONS (ISO)

### ISO requirements

An option must meet certain requirements to qualify as an incentive stock option. Each option that will be issued by the Company under the Company's 2004 Performance Incentive Plan will state whether the option is intended to qualify as an ISO, or is intended to be a non-qualified option. Generally, the requirements for an ISO include that the option price is not less than the value of the stock on the date of grant, the option is non-transferable, the term is not longer than 10 years, the plan under which the options are granted is approved by the shareowners, and the option does not contain a statement that it is intended to be a non-qualified option.

If the option qualifies as an ISO, and if certain requirements are met, the employee will receive ISO tax treatment. In general, these requirements are that the amount of stock covered by the option is within the annual limitation, the stock is held for the required ISO holding period, and the employment test is met.

If the requirements for ISO treatment are met, no income is recognized on exercise of the option (except for the purpose of the AMT). The employee's basis in the acquired stock is equal to the price paid for the stock. On the subsequent sale of the stock, the employee recognizes gain to the extent that the amount received exceeds his basis in the stock. The gain is taxed as capital gain. The capital gain rate that applies depends on the holding period. If the stock is held for more than one year from the date of exercise, the gain will be taxed at 15%.

**Example 8, ISO cash exercise.** On December 15, 2003, the employee is granted an ISO to purchase 150 shares at $25 per share. On December 16, 2004, the employee exercises the ISO for 150 shares, which are transferred to him on that date, and he pays the option price of $25 per share in cash. The market value of the stock at the time of exercise is $30. On January 20, 2006, the employee sells the stock for $40 per share. The employee does not recognize income at the time of exercise (except for the purpose of the AMT). His basis in the shares is $25, the price he paid. On the sale of the stock he recognizes gain of $15 per share ($40 sale price less $25 basis). The total gain of $2,250 ($15 per share times 150 shares) is taxable as a long-term capital gain at the 15% rate

5

because the stock was held for more than one year.

### Example 9 (Omitted)

*Alternative Minimum Tax (AMT)*

The alternative minimum tax or AMT is tax policy affected by schizophrenia. If a taxpayer would pay too little income tax because of the use of special tax provisions that provide favorable treatment of expenses or income items, the taxpayer might incur a liability under the AMT. The AMT is intended to prevent Congress from being embarrassed by newspaper reports of high-income taxpayers paying little of no tax. To prevent this, the AMT provides an overriding tax structure that applies if it produces a higher tax in any year than the regular tax. The 2003 tax legislation increases the exemption amount for some taxpayers.

The concept is this. The taxpayer computes his income in the regular way and than computes his regular income tax. He then computes his alternative minimum taxable income by adjusting his regular income for special items, sometimes called tax preferences. Then he computes his alternative minimum tax by applying the special AMT rates. To the extent that the AMT exceeds the regular tax, the taxpayer must pay the excess. However, he can get the AMT payment back in later years; he can claim a credit for the AMT payment in a subsequent year to the extent that the regular tax exceed the AMT in the subsequent year. Further, there may be offsetting adjustments to income in a subsequent year.

For the purpose of the AMT, the spread on an ISO (the difference between the option price and value of the stock on the date of exercise of the option) is an item of tax preference. This means that in computing alternative minimum taxable income for the year of exercise of an ISO, the taxpayer must include in income for AMT purposes the amount of the spread. However, in the case of the ISO preference, an offsetting adjustment will occur when the taxpayer sells the stock he acquired by exercising the ISO. More particularly, in the year of sale, for the purpose of computing the alternative minimum taxable income, the taxpayer increases his basis in the stock by the amount of the spread that was include in income as a preference, and takes a negative adjustment to alternative minimum taxable income for the year of sale. This will tend to make ATM less than the regular tax in the year of sale, thus supporting the taxpayer taking a credit in the year of sale for any AMT that was paid in the year of exercise of the option.

Whether the employee will incur an AMT liability in the year of exercise, and when he will be able to recover any AMT that had to be paid, depends on numerous factors affecting the returns for the year involved. It is often difficult to predict the outcome without reviewing all of the facts. Preparing pro-forma AMT calculations to show the amount of liability for the tax and the timing of the expected recover of any AMT payments is often helpful. Even if some AMT tax is incurred and it not recoverable for a period of time, there may still be substantial overall saving to an employee by exercising an ISO and holding the stock for the requisite holding period.

As a generalization, among the items includable in alternative minimum taxable income are

state taxes and ISO spread. There is an exempt amount which functions as a deduction against alternative minimum taxable income. The exempt amount varies with marital status and phases out as income exceeds specified levels. The tax rates for the AMT are 26% stepping up to 28%, with a 15% rate on long-term gains. Factors that help to avoid the AMT are low levels of preferences, lower income levels that preserve the exempt amount, or higher regular income tax rates that cause the total to exceed the AMT.

### *Annual limitation*

There is an annual $100,000 limitation on the amount of options that can qualify as ISOs. Each calendar year is tested separately. All options held by an employee that first become exercisable in the year are tested. Options cannot qualify as ISOs to the extent that the value of the stock covered by the options exceeds $100,000. The value of the stock for this purpose is the value of the stock on the date of the grant of the option.

The $100,000 limitation is applied separately for each year, but it is applies to all options regardless of when the option was granted, if the option first becomes exercisable in the testing year for all or any portion of the stock covered by the option. For example, a company granted an option in year one for 3,000 shares at $25, which is exercisable for 1,000 shares in year 2, 1,000 shares in year 3, and 1,000 shares in year 4. In year 2 the company granted an option for 3,000 shares at $30 which is exercisable for 1,000 shares in year 3, 1,000 shares in year 4, and 1,000 shares in year 5. In applying the $100,000 limitation, in year 2 there would be 1,000 shares valued at $25 for which the options first became exercisable ($25,000). In year 3 there would be would be two relevant options: i) the year 1 option that becomes exercisable for 1,000 shares at $25 ($25,000), and ii) the year 2 options that becomes exercisable for 1,000 share valued at $30 ($30,000), for a total for year 3 of $55,000.

**Example 10, $100,000 limitation.** To simplify this example, it is assumed the options become exercisable for <u>all shares</u> one year after the grant, rather than one third of the shares become exercisable each year. The company issues options meeting the ISO requirements to an employee in December 2003 covering $75,000 in stock valued as of December 2003. In December 2004 the 1998 options first become exercisable under the terms of the options that provide for exercise one year after grant. In December 2004 the Company issues options to the same employee covering $100,000 of stock, valued as of December 2004. In December 2004 there is a change of control of the company that causes the 2004 options to become immediately exercisable. As a result, $175,000 of purported ISOs would first become exercisable in 2004. The limitation would provide that the 2003 options covering $75,000 of stock continue to be eligible for ISO treatment. Only $25,000 of the 2004 options qualifies for ISO treatment. The $75,000 of excess 2004 options is treated as non-qualified options. The same result would occur if the company inadvertently issued options in excess of the $100,000 limitation.

### *Employment requirement*

To receive ISO treatment, the employee must have been an employee of the Company or a

subsidiary thereof from the date of grant of the option until at least within three (3) months of exercise of the option. If the employee were disabled, a one-year period would apply rather than a three-month period. For this purpose disabled means that the employee is unable to engage in any gainful employment by reason of physical or mental impairment which can be expected to result in death or last for a continuous period of at least 12 months.

**Example 11, employment test.** The employee is granted an ISO on December 16, 2002 to purchase 100 shares at $25 per share. On January 31, 2007, the employee retires from the company. On June 1, 2007, when the value of the stock is $95 per share, the employee exercises the ISO, paying the option price in cash. The employee recognizes ordinary income in the amount of $7,000 ($95 value less $25 option price times 100 shares). The exercise of the option does not comply with the ISO requirements because the option was not exercised within three months of the employee's termination of employment. The employee's basis in the shares is $9,500 ($25 option price plus $70 income times 100 shares).

## Holding periods

In order to receive ISO treatment, the employee must hold the stock both: i) for two years from the date of grant of the option, and ii) one year from the date the stock is transferred to the employee on exercise of the option. If the stock is disposed of before this time, the disposition is a disqualifying disposition and generally results in the employee recognizing ordinary income for the difference between the option price and value of the stock on the date of exercise, and capital gain for any increase in value after the date of exercise. For this purpose, stock is considered disposed of if it is sold, given away, or used to pay the option price on exercise of another ISO. (It may not be a disqualifying disposition for ISO stock to be used to pay the option price on an NQO. See Example 5.)

**Example 12, ISO disqualifying disposition by sale at a gain over value on date of exercise.** On December 16, 2002, an employee is granted an ISO for 150 shares of stock at a price of $25 per share. On January 5, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On December 1, 2004, the employee sells the stock on the stock exchange for $40 per share. The sale is a disqualifying disposition for two reasons. The stock was sold within two years of the grant of the option, and the stock was sold within one year from the exercise of the option and the transfer of the stock to the employee. As a result of the disqualifying disposition, the employee recognizes ordinary income in the amount of $750 (the difference between the option price of $25 and the $30 value of the stock on the date of exercise, times 150 shares) and $1,500 of capital gains (the difference between the $40 sale price and the basis of $30 per share, which is the option price plus the amount of ordinary income recognized, times 150 shares). Both the ordinary income and the capital gain are recognized for the employee's 2004-tax year. The capital gain is short-term because the stock was not held for more than one year.

**Example 13, ISO disqualifying dispositions by sale at less than the stock value on date of exercise.** On December 16, 2002, an employee is granted an ISO. On January 5, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On

8

December 1, 2004, the employee sells the stock on the stock exchange for $28 per share. The sale is a disqualifying disposition for two reasons. The stock was sold within two years of the grant of the option, and the stock was sold within one year from the exercise of the option and the transfer of the stock to the employee. As a result of the disqualifying disposition, the employee recognizes ordinary income in the amount of $450 (the difference between the option price of $25 and the $28 value of the stock on the date of sale, times 150 shares). He does not realize any capital gain because the employee's basis would be the same as the sale price. (The income would be limited to the amount that the sale price exceeded the exercise price because of a special rule that applies when the stock is disposed of in a transaction in which a loss would be recognized, such as a sale to a third party.)

If, however, the stock was disposed of in a transaction in which a loss would not be recognized, for example, the property was given away, sold to a spouse, or sold in a wash sale, the ordinary income amount would be equal to the spread between the option price and the value or the stock at the time of exercise ($30-$25). See Example 15. The income is recognized for the employee's 2004-tax year.

**Example 14, ISO disqualifying dispositions by sale at less than option prices.** On December 16, 2002, an employee is granted an ISO for 150 shares of stock at a price of $25 per share. On January 5, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On December 1, 2004, the employee sells the stock on the stock exchange for $23 per share. The sale is a disqualifying disposition for two reasons. The stock was sold within two years of the grant of the option, and the stock was sold within one year from the exercise of the option and the transfer of the stock to the employee. As a result of the disqualifying disposition, the employee would not recognize any ordinary income since the sale price is less than the option price, and the employee would recognize a capital loss of $300, the difference between the option price paid for the shares and the sale price ($25 less $23 times 150 shares). No ordinary income was recognized because of a special rule that applies when the stock is disposed of in a transaction in which a loss would be recognized. If, on the other hand, the property were disposed of in a transaction on which a loss would not be recognized, for example, the property was given away, sold to a spouse, or sold in a wash sale, the ordinary income amount would be equal to the spread between the option price and the value at the time of exercise. See Example 15. The capital loss would be recognized for the employee's 2004-tax year.

**Example 15, ISO disqualifying disposition by gift.** On December 16, 2002, an employee is granted an ISO for 150 shares of stock at a price of $25 per share. On January 2, 2004, the employee exercises the option for cash and receives the stock with a value of $30 per share. On December 2, 2004, the employee gives the stock to his son. The gift constitutes a disqualifying disposition for two reasons. The stock was disposed of within two years of the grant of the option, and the stock was disposed of within one year from the exercise of the option and the transfer of the stock to the employee. The effect of the gift would be as follows:

i) If the value of the stock on the date of the gift were $40 per share, the employee would recognize ordinary income of $750 (the difference between the $30 value of the stock on the date of exercise of the option and the $25 exercise price). The son's basis in the stock would be the same as the employee's basis, $30 per share, the option price, plus the income recognized.

ii) If the value of the stock on the date of the gift were $20 per share, the employee would recognize ordinary income of $750 (the difference between the $30 value of the stock on the date of exercise of the option and the $25 exercise price). The employee's basis in the stock would be $30 per share. The employee would not be allowed to recognize a capital loss because the disposition was a gift. The son's basis in the stock would depend on subsequent circumstances. For determining gain on sale of the stock, the employee's basis of $30 per share would carry over and become the son's basis. For determining a loss on the sale of the stock, the son's basis would be $20 per share, the value of the stock on the date of the gift.

**Example 16, ISO exercise with pre-holding period ISO stock.** In November 2005, the value of the stock is $50 per share. The employee exercises an ISO granted in 2004 to purchase 100 shares at $40 per share. The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) acquired in December 2004 for $25 per share by exercise of an ISO that had been granted in December 2003. In December 2004 the value of the stock was $30 per share. The two-year holding period would not be met for the 2003 ISO stock, and therefore there is a disqualifying disposition of the 2003 ISO stock. For tax purposes, two transactions will occur in 2000: the exchange of 80 old shares for 80 new shares, and the transfer of 20 additional new shares to the employee.

Exchange of 80 shares. A special rule applies in this case where and ISO is exercised with ISO stock that was not held for the ISO holding periods. Gain is recognized on the exchange of old ISO stock for new ISO stock, although a loss would not be recognized because of the wash sale rules. As a result, the employee recognizes gain in the amount of $2,000, the difference between his basis in the old stock ($25 times 80 shares equals $2,000) and the value of the new stock ($50 times 80 shares equals $4,000). This $2,000 gain consists of two elements:

i) $400 will be taxed as ordinary income, the difference between the option price for the old stock and the value of the stock on the date of exercise of the first option ($30 less $25 times 80 shares);

ii) $1,600 will be taxed as capital gain, the difference between the value of the stock on the date of exercise of the second option, and the sum of the employee's basis in the old stock and the ordinary income recognized on the exchange [$50 less ($25 plus $5) times 80 shares]. The capital gain would be short-term because the stock did not satisfy the more than one-year holding period.

The employee's basis in the 80 new shares will be $50 per share, reflecting his cost of $25 for the old shares, and the $25 of ordinary income and gain recognized on the exchange for the new shares. For the purpose of the more than one-year holding period required for the lower capital gains rates, the 80 exchanged shares will be considered to be acquired on the date the new shares are transferred to the employee.

20 additional new shares. The 20 additional new shares that the employee receives on

10

exercise of the second ISO will be eligible for ISO treatment.  Therefore the employee will not recognize income at the time of exercise, and he will be eligible for capital gain treatment on the sale of the stock if the holding periods and employment tests are satisfied.  The employee's basis in the 20 shares will be zero since he will have recognized no income with respect to the shares.  For the purpose of the more than one-year period required for lower capital gain rates, the new 20 shares will be considered to be acquired on the date the shares are transferred to the employee.

**Example 17, ISO exercise with post holding period ISO stock.**  In April 2005 the value of the stock is $50 per share.  The employee exercises an ISO granted in 2003 to purchase 100 shares at $40 per share.  The employee pays the option price of $4,000 by transferring to the company 80 shares of stock ($4,000 divided by $50) acquired in December 2002 for $25 per share by exercise of an ISO that had been granted in December 2001.  Because both holding periods are met for the 1995 ISO stock, use of the stock to pay the option price is not a disqualifying disposition.  The employee will be treated as having exchanged 80 old shares for 80 new shares.  This exchange is non-recognized as an exchange of common stock for common stock in the same corporation.  The employee's basis in his old shares carries over to become his basis in the new shares, so he has 80 new shares with a basis of $25 per share ($2,000).  The employee's basis in the other 20 shares is zero, because he did not recognize any income on exercise of the ISO.  For the purpose of the more than one year holding period required for the lower capital gain rates, the 80 exchanged shares will be considered to be acquired on the date the old 80 shares were acquired, and the new 20 shares will be considered to be acquired on the date the shares are transferred to the employee.

**Example 18, ISO exercise with NQO stock.**  The facts are the same as Example 17 except the stock used to pay the exercise price was acquired by exercise of a NQO.  The result is the same as Example 17 except there is no issue of a disqualifying disposition because no ISO stock was used to pay the exercise price.

R. G. Martinell

N:\CAK\Stock Option File\Tax memo re stock options for 2004 PIP.doc



ANNETTE FREUND – VICE PRESIDENT, COMPENSATION, BENEFITS AND HR SUPPORTS

08CV3038                    TG
JUDGE DARRAH
January 15, 2008    MAGISTRATE JUDGE NOLAN

To: Holders of Navistar International Corporation
      Stock Options

Re: Stock Option Statement

Enclosed is your Navistar International Corporation (the "Company") Stock Option Statement as of December 31, 2007.

As you may already know, the Company is not current with its financial filings with the Securities and Exchange Commission. As a result, there are certain limits on your ability to exercise your stock options.

In addition, some of your stock options may have expired or will expire in the near future. We plan to address this issue but we are unable to do so now. Once we file our Form 10-K for the 2006 fiscal year and the 2007 fiscal year, and become current with our quarterly reports for fiscal year 2008, our plan is to discuss this issue with our Board of Directors. We cannot predict what, if any, action our directors will take, but we will communicate with you, no matter what the outcome, once that process is completed.

The attached page summarizes how certain stock option transactions will be handled until the Company becomes current with its financial reporting.

In the meantime, if you have any questions that are not answered here or if you plan to conduct any stock option transactions during this time, please contact Howard Kuppler at (630) 753-2149.

Sincerely,

*Annette*

Attachments

XOP1255NAV

# TRANSACTION SUMMARY

| Transaction Type | Action that Can be Taken |
| --- | --- |
| Cashless Exercise of Stock Options | NOT ALLOWED until the Company is current with its public filings. |
| Cash Exercise of Stock Options | Allowed if optionee exercising stock options is an accredited investor see below for definition of accredited investor), however shares issued would be restricted and any sale of the shares would be governed by Rule 144 (See Rule 144 below). |
| Stock Swap Exercise of Stock Options | Allowed if optionee exercising the options is an accredited investor (see below for definition of accredited investor), however shares issued would be restricted and any sale of the shares would be governed by Rule 144 (See Rule 144 below). |

1. Definition of Accredited Investor:  (i) is a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of the purchase of the securities exceeds $1,000,000; or (ii) is a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year.

2. Summary of Rule 144:  Shares can only be sold after 2 years if not an affiliate of the Company *or* until 1 year has passed and all of the Company's financial statement filings are current.  Any sale must also comply with the other limitations of Rule 144.

XOP1255NAV